**NIPPON STEEL CORPORATION, NKK Corporation, Kawasaki Steel Corporation, and Sumimoto Metal Industries, Ltd., Plaintiffs–Appellees,**

v.

**UNITED STATES,**

and

**USS–POSCO Industries, Defendants–Appellants.**

**Nos. 99–1379, 99–1386.**

United States Court of Appeals, Federal Circuit.

July 26, 2000.

Theodore B. Olson, Gibson, Dunn & Crutcher, LLP, of Washington, DC, argued for plaintiffs-appellees. With him on the brief were Daniel J. Plaine, Douglas R. Cox, Miguel A. Estrada, John H. Sturc, and Lisa A. Murray. Of counsel on the brief were Matthew J. Clark, Howrey & Simon, of Washington, DC; Daniel L. Porter; and James P. Durling, Willkie, Farr & Gallagher, of Washington, DC;

and Leonard M. Shambon, Wilmer, Cutler & Pickering, of Washington, DC.

Roger M. Golden, Fenwick & West, LLP, of Washington, DC, argued for defendant-appellant USS–POSCO Industries. With him on the brief were Phyllis E. Andes, and Patrick C. O'Brien.

Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant United States. On the brief were David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; and Katherine A. Barski, Attorney. Of counsel on the brief were Stephen J. Powell, Chief Counsel; Elizabeth C. Seastrum, Senior Counsel; Thomas H. Fine, Senior Attorney; and Melanie A. Frank, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

Before LOURIE, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and LINN, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

This government appeal challenges a preliminary injunction of the Court of International Trade prohibiting the Department of Commerce from continuing its administrative proceeding under 19 U.S.C. § 1677j(c) and 19 C.F.R. § 351.225(i) (1998) to determine whether certain imported steel had been "altered in form . . . in minor respects" and therefore still was covered by an antidumping duty order, even though the altered products were not within the literal scope of the order. The Court of International Trade held that the altered products were "expressly and unambiguously" excluded from that order, and that Commerce's inquiry to determine whether the order covers the products "is ultra vires." We hold that Commerce's inquiry was permissible, and therefore reverse the preliminary injunction and remand to the Court of International Trade with instructions to dismiss the complaint.

I

A. In response to a petition filed by American steel companies seeking anti-dumping duties on carbon steel products from Japan and after an investigation, Commerce found that such steel products from Japan were being "dumped" in the United States, i.e., sold at less than fair value. *See* 58 Fed.Reg. 37154 (1993).

Commerce subsequently issued an order imposing antidumping duties. Antidumping Duty Orders: Certain Corrosion–Resistant Carbon Steel Flat Products From Japan, 58 Fed.Reg. 44163 (1993) ("antidumping duty order"). It described various products the order covered, and excluded other "flat rolled steel products" and products of specified dimensions. *See id.*

Although the antidumping duty order did not define "carbon steel," that term was defined in the petition that led to the investigation, the questionnaires Commerce sent to Japanese steel producers and Commerce's preliminary and final investigation results. The parties agree that that is the proper definition, and we have no reason to disagree.

Those documents adopted the definition of "carbon steel" in the Harmonized Tariff Schedule of the United States ("HTSUS"). The petition, for example, states:

·The term "carbon steel" as used in this Petition, is equivalent to the HTS term "non-alloy" steel, which is defined as *other than:*

1) "stainless steel" . . .; or

2) "other alloy steel": steel other than stainless and containing by weight one or more of the following elements in the following proportions:

This is followed by a list of specified percentages by weight of fifteen listed elements and one general category covering "other elements." In other words, steel that contains more than the stated percentage of any one of the listed elements is "other alloy steel," and therefore not "carbon steel."

One of the fifteen elements thus listed, which is the only one involved in this case, was

    0.0008 percent or more of boron.

B. Approximately five years after the antidumping duty order was issued, an American steel company filed with Commerce a petition to initiate an inquiry "to determine whether imports of boron-added Japanese hot-dipped and electrolytic corrosion-resistant steel sheet, falling within the physical dimensions outlined in the scope of the order, are circumventing the antidumping duty order on corrosion-resistant carbon steel sheet from Japan." The petition stated: "Japanese exporters have been circumventing the order by exporting hot-dipped and electrolytically zinc coated sheet by adding small amounts of boron—[stated percentages exceeding 0.0008] by weight based on laboratory tests of two samples." It further stated that the "cost of adding small amounts of boron is infinitesimal, and the resulting product with boron is virtually identical to the original product without boron," and that "consumers . . . do not rely on or benefit from the presence of boron and thus do not expect, seek, or desire its presence." The petition also stated that the appellees Nippon Steel Company and three other Japanese companies (collectively Nippon Steel) either have produced and exported the challenged imports or were capable of doing so.

In response to the petition, Commerce initiated "an anticircumvention inquiry to determine whether imports of boron-added hot-dipped and electrolytic corrosion-resistant carbon steel sheet, falling within the physical dimensions outlined in the scope of the order, are circumventing the antidumping duty order on corrosion-resistant carbon steel flat products from Japan." 63 Fed.Reg. 58364 (1998). The notice initiating the inquiry described the appellees as "interested parties," who have "submitted comments." *See id.* at 58366.

Nippon Steel then filed the present case in the Court of International Trade to

enjoin Commerce from conducting the anticircumvention inquiry. It sought a temporary restraining order (which the court issued), and preliminary and permanent injunctions. After a hearing, the court entered a preliminary injunction.

In its findings and conclusions, the court first held that it had jurisdiction under 28 U.S.C. § 1581(i), which gives that court jurisdiction where "meaningful relief would not be available were one to await the conclusion of administrative proceedings." *Nippon Steel Corp. v. United States*, No 98–10–03102, slip op. at 5 (Ct. Int'l Trade Mar. 9, 1999). The court then applied the traditional four-part test governing preliminary injunctions, and concluded: 1) that Nippon demonstrated "a high likelihood of success on the merits" because the products in question were "expressly and unambiguously" excluded from the duty order; 2) that Nippon will suffer irreparable harm if "forced to defend themselves in an ultra vires administrative proceeding" which was "initiated without legal authority"; 3) that the balance of hardships favored granting the preliminary injunction because Commerce would "suffer no harm if an administrative proceeding initiated without authority of law is enjoined"; and 4) that "the public interest [would be] served by enjoining an administrative proceeding initiated without authority of law." *Id.*, slip op. at 5–7.

## II

■ The Court of International Trade ruled that it "has jurisdiction over Plaintiffs' request for a preliminary injunction pursuant to 28 U.S.C. § 1581(i)." *Id.* at 5. Section 1581(i) is a catch-all jurisdictional provision which authorizes the court to "conduct review under the general authority of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, but only when review would never be available under one of the other subsections of 28 U.S.C. § 1581, or when the remedy afforded by the other subsections would be 'manifestly inadequate.'" *Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United States*, 104 F.3d 1309, 1312 (Fed.Cir.1997).

The court quoted the following statement from *Hylsa, S.A. v. United States*, 960 F.Supp. 320, 324 (Ct. Int'l Trade 1997), *aff'd*, No. 97–1270, 1998 WL 56389, 1998 U.S.App. LEXIS 1896 (Fed.Cir. Feb. 12, 1998): "28 U.S.C. § 1581(i) is a Congressional fail-safe device. If the circumstances of a case are sufficiently unusual so that one may presume that Congress could not have provided for such a case under the general language of 19 U.S.C. § 1516a, and meaningful relief would not be available were one to await the conclusion of administrative proceedings, 28 U.S.C. § 1581(i) is available to afford a means of vindication of statutory rights." *Id.* It then stated: "Here Plaintiffs would have no opportunity for meaningful relief under 28 U.S.C. § 1581(a)-(h). It would be impossible to remedy Plaintiffs' losses after the anticircumvention proceeding was completed. An ex post facto decision by this Court declaring the administrative proceeding ultra vires would be a pyrrhic victory for Plaintiffs." *Id.* at 5–6.

The parties debate whether the Court of International Trade had jurisdiction over this case under 28 U.S.C. § 1581(i). The government contends (1) that Commerce properly initiated its minor alterations inquiry, (2) that Nippon Steel may review Commerce's final order in that inquiry pursuant to 28 U.S.C. § 1581(c), and (3) that that remedy would be fully adequate. Nippon Steel responds that Commerce exceeded its authority in initiating the inquiry and that judicial review after the allegedly illegal inquiry has been completed would not provide adequate relief.

The jurisdictional inquiry whether "the remedy afforded by the other subsections would be 'manifestly inadequate'" is closely related to the question on the merits of the preliminary injunction—whether denial of such relief would cause Nippon Steel irreparable injury by requiring it to participate in an allegedly illegal administrative proceeding. In similar situations in the past we have "concluded that the plaintiff was not entitled to relief in any event," and

therefore found it "unnecessary to decide" "whether the Court of International Trade properly exercised review under 28 U.S.C. § 1581(i)." *Shakeproof,* 104 F.3d at 1313; *see also Asociacion Colombiana de Exportadores de Flores v. United States,* 903 F.2d 1555, 1559 (Fed.Cir.1990); *Sharp Corp. v. United States,* 837 F.2d 1058, 1062 (Fed.Cir.1988). The same course appears appropriate here. The only question is whether the intervening decision of the Supreme Court in *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), precludes that action.

*Steel Co.* was "a private enforcement action under the citizen-suit provision of the Emergency Planning and Community Right–To–Know Act of 1986 (EPCRA), 100 Stat. 1755, 42 U.S.C. § 11046(a)(1)," which requires users of toxic and hazardous chemicals to file certain reports. *Id.* at 86, 118 S.Ct. 1003. The question on the merits was whether that Act authorized suits for past injuries. The district court dismissed the suit for lack of jurisdiction and for failure to state a claim upon which relief could be granted. The court of appeals, without determining whether the district court had jurisdiction, reversed the district court ruling on the merits.

The Supreme Court ruled that the court of appeals had erred in failing to determine, before deciding the merits, whether the district court had jurisdiction. It rejected the position of several courts of appeals "which find it proper to proceed immediately to the merits question, despite jurisdictional objections, at least where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied." *Id.* at 93, 118 S.Ct. 1003. It stated:

> We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers. This conclusion should come as no surprise, since it is reflected in a long and venerable line of our cases. Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause. On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it. The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception.

*Id.* at 94–95, 118 S.Ct. 1003 (internal quotation marks and citations omitted).

The Court then held that the district court had no jurisdiction because the plaintiff lacked standing to maintain the suit. *See id.* at 102–110, 118 S.Ct. 1003.

The Supreme Court itself has cautioned that broad language in judicial opinions must be read in light of the issue before the court. *See Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 89 L.Ed. 118 (1944); *see also Canadian Imperial Bank of Commerce v. Wells Fargo Bank,* 811 F.2d 1490, 1494 (Fed.Cir.1987). In *Steel Co.* the Court recognized that "some" of its prior cases "must be acknowledged to have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question." 523 U.S. at 101, 118 S.Ct. 1003. One of those cases was *Norton v. Mathews,* 427 U.S. 524, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976), in which the Court had bypassed the jurisdictional question, which it had resolved in another simultaneously decided case, and proceeded to decide the merits. It there explained:

> It thus is evident that, whichever disposition we undertake, the effect is the same. It follows that there is no need to decide the theoretical question of juris-

diction in this case. In the past, we similarly have reserved difficult questions of our jurisdiction when the case alternatively could be resolved on the merits in favor of the same party. See *Secretary of the Navy v. Avrech*, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974). The Court has done this even when the original reason for granting certiorari was to resolve the jurisdictional issue. See *United States v. Augenblick*, 393 U.S. 348, 349–352, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). Although such a disposition would not be desirable under all circumstances, we perceive no reason why we may not so proceed in this case where the merits have been rendered plainly insubstantial. Cf. *McLucas v. DeChamplain*, 421 U.S. [21], at 32 [95 S.Ct. 1365, 43 L.Ed.2d 699 (1975)]. Making the assumption, then, without deciding, that our jurisdiction in this cause is established, we affirm the judgment in favor of the Secretary on the basis of our decision in *Mathews v. Lucas, ante*, [427 U.S.] p. 495 [96 S.Ct. 2755, 49 L.Ed.2d 651 (1976)].

*Id.* at 532–533, 96 S.Ct. 2771.

Despite the broad language in the opinion, the holding in *Steel Co.* was that the court of appeals had erred in deciding the merits (in favor of the plaintiff) without first determining whether the plaintiff had standing. There the jurisdictional question (standing) was unrelated to the merits question (whether the statute authorized suit for past violations), and answering the former did not require consideration of the latter. Indeed, the Supreme Court ruled that the plaintiff lacked standing without addressing the merits.

■ In the present case, in contrast, the jurisdictional issue and the merits are inextricably intertwined, and the former cannot be resolved without considering and deciding (at least in part) the latter. The Court of International Trade's jurisdiction under 28 U.S.C. § 1581(i) turns here on whether Commerce's initiation of its minor alterations inquiry was proper or beyond the agency's authority. If it was proper,

the Court of International Trade had no basis for its preliminary injunction. Thus, both the merits and the jurisdictional inquiry turn, at least in part, upon the same question: Did Commerce act within its authority in initiating its inquiry?

In this unusual situation, we do not believe that *Steel Co.* precludes us from bypassing the jurisdictional question and deciding the merits. If, as we now hold, Commerce acted properly, the appropriate disposition of the case would be the same as if we had determined that for that reason the Court of International Trade lacked jurisdiction: reversal of the preliminary injunction and remand for dismissal of the complaint.

III

"The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction. As Professor Jaffe puts it, '[t]he exhaustion doctrine is, therefore, an expression of executive and administrative autonomy.' This reason is particularly pertinent where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise." *McKart v. United States*, 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (citation omitted).

■ Two other principles also are relevant: (1) The doctrine of primary jurisdiction "that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conf. v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952); (2) "Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury," *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) (quoting *Rene-*

*gotiation Bd. v. Bannercraft Clothing Co.,* 415 U.S. 1, 24, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974)).

If the Court of International Trade had followed and applied these principles, it could not and would not have preliminarily enjoined Commerce from conducting its anticircumvention inquiry.

■ A. Under 19 U.S.C. § 1677j(c)(1), which is captioned "Prevention of circumvention of antidumping and countervailing duty orders," "[t]he class or kind of merchandise subject to—(A) an investigation under this subtitle [or] (B) an antidumping duty order ..."

> shall include articles altered in form or appearance in minor respects ... whether or not included in the same tariff classification.

The governing regulations provide that the Secretary of Commerce, either on his own initiative or pursuant to an application filed by an "interested party," upon determining that

> an inquiry is warranted to determine whether a product is included within the scope of an antidumping ... duty order ... will initiate an inquiry, and will notify all parties on the Department's scope service list of its initiation of a scope inquiry.

19 C.F.R. § 351.225(a)–(c) (1998).

> The regulation further provides:

> (i) Minor alterations of merchandise.... [T]he Secretary may include within the scope of an antidumping ... duty order articles altered in form or appearance in minor respects.

19 C.F.R. § 351.225(i).

That is precisely what Commerce did in this case.

In response to a petition by an American steel company alleging that "Japanese exporters have been circumventing the [antidumping duty] order by exporting hot-dipped and electrolytically zinc coated sheet by adding small amounts of boron— [stated percentages exceeding 0.0008] by weight based on laboratory tests of two samples," Commerce initiated "an anticircumvention inquiry to determine whether [those] imports ... are circumventing the antidumping duty order." 63 Fed.Reg. 58364 (1998). The notice stated that in conducting the inquiry Commerce would consider the following five criteria, upon which it "generally relied" "[i]n conducting circumvention inquiries" and with respect to which the American company "has presented evidence": the "overall physical characteristics" of the challenged product, the "expectation of the ultimate users" of the product, the use of the product, the channels through which the product is sold and the cost of adding boron to the product. *Id.* at 58365. The notice set out in considerable detail the American company's allegations under each of these criteria. *Id.* at 58365–66.

In initiating the inquiry, Commerce was performing a function Congress has given it—to determine whether an antidumping duty order has been circumvented by making minor alterations in the form of the product otherwise subject to that order. "The Secretary may include within the scope of an antidumping ... duty order articles altered in form or appearance in minor respects." 19 C.F.R. § 351.225(i); *see also* 19 U.S.C. § 1677j(c). As this court explained in *Wheatland Tube Co. v. United States,* 161 F.3d 1365, 1370 (Fed. Cir.1998): "Section 1677j(c) reflects Congress' concern that foreign producers were circumventing antidumping duty orders by making minor alterations to products falling within the scope of an order in an effort to take these products outside of the literal scope" (discussing the legislative history).

In conducting the inquiry and determining whether the antidumping duty order has been circumvented, Commerce will be required to exercise and apply its expertise and experience in and to a difficult and complex subject. The inquiry probably will involve subtle distinctions and difficult economic issues relating to the nature of, the reason for and the effect of the changes Nippon Steel made in its steel

products. The character of the inquiry means that Commerce's proceeding will both "involve exercise of discretionary powers" given it by Congress and "require application of special expertise." It would be most inappropriate for a court to "interfere with" the ongoing administrative proceedings until Commerce "has completed its action," *McKart, supra,* at which time any decision by Commerce adverse to Nippon steel may be judicially challenged in the usual manner.

B. The Court of International Trade held, however, that this court's "reasoning" in *Wheatland Tube* "applies with equal force in this case" and shows that Commerce's inquiry is "ultra vires." *Nippon Steel,* slip op. at 7. That conclusion misreads *Wheatland Tube.*

*Wheatland Tube* involved an antidumping duty order covering certain types of imported "standard" steel pipe, generally used for relatively undemanding applications such as plumbing and fencing. *See* 161 F.3d at 1367. During the administrative proceedings the respondents requested clarification whether the inquiry included the more expensive, higher quality "line pipe" typically used in more demanding applications. *See id.* The complainants responded that the petition "clearly excludes" such pipe. *See id.* The antidumping order expressly reflected this exclusion: "[L]ine pipe of a kind used for oil or gas pipelines is ... not included in this investigation." *Id.* (emphasis omitted).

Shortly after Commerce issued the order, Wheatland discovered that the foreign producers had begun selling line pipe for use in standard pipe applications, and filed a "minor alterations" anticircumvention petition pursuant to 19 U.S.C. § 1677j(c). *See id.* at 1368. Commerce determined, however, "that a scope inquiry pursuant to 19 C.F.R. § 353.29(i) [rather than a 'minor alterations' inquiry under section 353.29(g) (the C.F.R. provision that mimics 19 U.S.C. § 1677j(c))] is the appropriate action to respond to the issues raised by petitioners." *See id.* (emphasis omitted). In that proceeding Commerce then ruled

that the challenged products did not fall within the scope of the antidumping order because the order expressly excluded them. *See id.*

This court affirmed. We upheld Commerce's scope determination, because

> Substantial evidence supports Commerce's conclusion that the line and dual-certified pipe accused of circumventing the *Standard Pipe Orders* is the same pipe that the orders expressly exclude.... Because the description of the merchandise contained in the initial investigation and the *Orders* is unambiguous, Commerce was not required to examine the physical characteristics of the accused product, the expectations of the ultimate purchasers, the ultimate use of the accused product, or the channels of trade.

*Id.* at 1369 (citations omitted).

We then sustained Commerce's decision to conduct a scope inquiry rather than a "minor alterations" inquiry under section 1677j(c). We noted that "[i]n essence, section 1677j(c) includes within the scope of an antidumping duty order products that are so insignificantly changed from a covered product that they should be considered within the scope of the order even though the alterations remove them from the order's literal scope," but "does not ... apply to products unequivocally excluded from the order in the first place." *Id.* at 1371. Since the order expressly excluded "line pipe," a "minor alterations inquiry is ... unnecessary" and "Commerce's decision to conduct a scope inquiry instead of a minor alterations inquiry was not arbitrary." *Id.*

We stated:

> Applied to the present case, section 1677j(c) requires the scope of the *Standard Pipe Orders* to include the enumerated products plus minor alterations— products that are so insignificantly changed from a covered product that they should be considered within the scope of the order. If these minor alter-

ations include line and dual-certified pipe, then the *Standard Pipe Orders* would read: "All carbon steel pipes and tubes within the physical description outlined above [*plus*, under the minor alterations provision, *line* and *dual-certified pipe*] are included within the scope of these orders, *except line pipe ... [and][s]tandard pipe that is dual or triple certified/stenciled....*" This interpretation renders the orders internally inconsistent because it both excludes and includes the same products—line and dual-certified pipes. A minor alterations inquiry is, therefore, unnecessary because it can lead only to an absurd result.

*Id.* (citation omitted).

*Wheatland Tube* differs from the present case in three critical respects.

First, it involved judicial review of final agency action taken after full administrative proceedings (the scope determination) and not, as in the present case, an injunction barring the agency from conducting an administrative proceeding. Second, it involved a scope determination (whether the antidumping duty order covered a particular product) rather than, as here, a minor alterations inquiry into whether alterations in a product took it outside the scope of the order. Although the court held that Commerce justifiably had decided to conduct a scope investigation, it did not hold that Commerce had no authority to conduct a minor alterations inquiry. Third, it involved two different products, both of which were well known when the order was issued, and not, as here, a product produced by making allegedly insignificant alterations to an existing product. *Wheatland Tube* involved issues quite different from those in the present case, and does not support the Court of International Trade's decision here.

The Court of International Trade relied upon the statement in *Wheatland Tube* that the minor alterations provision "does not ... apply to products unequivocally excluded from the order in the first place." 161 F.3d at 1371. The court concluded

that because the antidumping duty order "exclude[d] alloy steel containing more than 0.0008% boron," that product "may not be brought within the scope of that order by the use of the anticircumvention statute." *Nippon Steel,* slip op. at 6–7. As we noted in Part II of this opinion, however, that broad language in *Wheatland Tube* must be interpreted in light of the issue before the court. *See Armour,* 323 U.S. at 133, 65 S.Ct. 165; *Canadian Imperial Bank of Commerce,* 811 F.2d at 1494. The statement was made in determining the propriety of Commerce's conducting a scope rather than a minor alterations inquiry. The court held that because line pipe was specifically excluded from the antidumping duty order, that order could not be interpreted to cover it, and that Commerce therefore correctly declined to conduct a minor alterations inquiry.

The statement cannot be read as barring Commerce from conducting an inquiry to determine whether the addition of a small amount of boron constituted a minor alteration that still left the product subject to the antidumping duty order. Indeed, the Court of International Trade's ruling is contrary to the statement in *Wheatland Tube* that "section 1677j(c) includes within the scope of an antidumping duty order products that are so insignificantly changed from a covered product that they should be considered within the scope of the order even though the alterations remove them from the order's literal scope." *Id.*

This analysis also invalidates the Court of International Trade's ruling that "if the product at issue here were found to constitute a 'minor alteration,' the antidumping order would both exclude alloy steel containing more than 0.0008% boron and include alloy steel containing more than 0.0008% boron. Because the anticircumvention inquiry in this case, like that in Wheatland, could only lead to 'an absurd result,' the inquiry is ultra vires." *Nippon Steel,* slip op. at 6–7. The "absurd result" reasoning in *Wheatland Tube* related to

the holding that Commerce properly had conducted a scope rather than a minor alterations inquiry. It does not cover Commerce's decision to institute a minor alterations inquiry in the present case since, as *Wheatland Tube* stated, such an inquiry properly covers products that "are so insignificantly changed from a covered product that they should be considered within the scope of the order even though the alterations remove them from the order's literal scope." *Id.*

C. Since the Court of International Trade could not validly enjoin Commerce from conducting this anticircumvention inquiry, the appropriate disposition of this appeal is to reverse the preliminary injunction and to remand for that court to dismiss the complaint.

CONCLUSION

The preliminary injunction of the Court of International Trade enjoining Commerce's anticircumvention inquiry is reversed, and the case is remanded to that court with instructions to dismiss Nippon's complaint.

*REVERSED AND REMANDED.*