The **CENTER FOR REPRODUCTIVE LAW AND POLICY, Janet Benshoof, Anika Rahman, Katherine Hall Martinez, Julia Ernst, Laura Katzive, Melissa Upreti, Christina Zampas, Plaintiffs–Appellants,**

v.

George W. **BUSH, in his official capacity as President of the United States, Colin Powell, in his official capacity as Secretary of State, Andrew Natsios, in his official capacity as Administrator of the United States Agency for International Development, Defendants–Appellees.**

**Docket No. 01–6168.**

United States Court of Appeals, Second Circuit.

Argued: March 13, 2002.

Decided: Sept. 13, 2002.

Simon Heller, The Center for Reproductive Law & Policy, New York, N.Y. (Janet Benshoof, on the brief), for Plaintiffs–Appellants.

Gregory G. Katsas, Deputy Assistant Attorney General, Washington, D.C. (Robert D. McCallum, Jr., Assistant Attorney General; Robert M. Loeb and Sharon Swingle, Attorneys, Department of Justice Civil Division; James B. Comey, United States Attorney; Gideon A. Schor, Chief Appellate Attorney, on the brief), for Defendants–Appellees.

Before: McLAUGHLIN, LEVAL, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

This suit was brought by a domestic organization that advocates reproductive rights and by attorneys employed by the organization. Plaintiffs challenge the so-called "Mexico City Policy," pursuant to which the United States government requires foreign organizations, as a condition of receiving government funds, to agree neither to perform abortions nor to promote abortion generally. Plaintiffs maintain that these restrictions violate their First Amendment rights to freedom of speech and association. The district court dismissed the case for lack of subject matter jurisdiction, finding that plaintiffs lack standing under Article III of the Constitution. The district court was following the general rule, set forth by the Supreme Court in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), that a federal court may not assume it has jurisdiction over a matter and proceed directly to the merits. The instant case is exceptional, however. Some twelve years ago we entertained and rejected, on the merits, the same constitutional challenge to the provision at issue here. We therefore find that this case falls within an exception recognized by the Supreme Court in *Steel Co.*, and we dismiss the First Amendment claim on the merits without deciding the standing question. Plaintiffs also bring claims under the Due Process Clause and the equal protection component of the Fifth Amendment. We dismiss the due process claim under the doctrine of prudential standing, as plaintiffs' alleged harm does not fall within the zone of interests protected by the Due Process Clause. We dismiss the equal protection claim as without merit; while plaintiffs do have standing for this claim under the concept we have dubbed "competitive advocate standing," the classification they challenge does not constitute an equal protection violation.

## BACKGROUND

We accept the allegations in the complaint as true on this motion to dismiss. The facts of this case, which are set forth in greater detail by the district court, *see Center for Reproductive Law & Policy v. Bush,* No. 01 CIV. 4986, 2001 WL 868007 (S.D.N.Y. July 31, 2001) (*"CRLP "*), are as follows. Plaintiff The Center for Reproductive Law & Policy ("CRLP") is a non-profit advocacy organization devoted to the promotion of reproductive rights. Individual plaintiffs Janet Benshoof, Anika Rahman, Katherine Hall Martinez, Julia Ernst, Laura Katzive, Melissa Upreti and Christina Zampas are CRLP staff attorneys engaged in the organization's global mission of reproductive law reform. Defendant George W. Bush is the President of the United States. Defendant Colin Powell is the U.S. Secretary of State and is thus responsible for "ensuring program and policy coordination among agencies of the United States Government in carrying out the policies set forth in the Foreign Assistance Act...." 22 U.S.C. § 6593(b)(2). Defendant Andrew Natsios is the Administrator of the United States Agency for International Development ("USAID"). At issue in this case is the so-called "Mexico City Policy"[1] of the United States government, whereby foreign non-governmental organizations ("NGOs") receiving U.S. government funds must agree to a provision called the "Standard Clause," which prohibits the organizations from engaging in activities that promote abortion (also referred to as the "challenged restrictions").

The Foreign Assistance Act of 1961 ("FAA") authorizes the President "to furnish assistance, on such terms and conditions as he may determine, for voluntary population planning." 22 U.S.C. § 2151b(b). The President's authority to allocate FAA funding has been delegated to the Secretary of State and, in turn, to the Administrator of USAID. See Exec. Order No. 13,118, 64 Fed.Reg. 16,595 (Mar. 31, 1999); State Department Delegation of Authority No. 145 1, 45 Fed.Reg. 51,974 (Aug. 5 1980); International Development Cooperation Agency Delegation of Authority No. 7, 45 Fed.Reg. 52,470 (Aug. 7, 1980). In 1973, Congress enacted the Helms Amendment, which prohibits the use of foreign assistance funds to pay for, among other things, "the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions." 22 U.S.C. § 2151b(f)(1). This restriction applies only to the use of U.S. government funds; foreign NGOs receiving assistance may still promote abortion with non-U.S. government funds without violating the terms of the statute. The executive branch, however, has attached additional conditions to the granting of foreign assistance funds, as it is authorized to do by the FAA. *See* 22 U.S.C. § 2151b(b). These additional conditions are the subject of this suit.

The challenged restrictions originated in August 1984, when President Ronald Reagan announced the Mexico City Policy ("the Policy"). The Policy expressed the government's disapproval of abortion as an element of family planning programs and set forth various ways in which the government would prohibit its funds from being used to support abortion overseas. Among these, it was announced that "the United States will no longer contribute to separate nongovernmental organizations which perform or actively promote abortion as a method of family planning in

---

1. The term derives from a United Nations conference held in Mexico City in 1984, at which the United States delegation presented a policy statement outlining the type of abortion-related restrictions at issue in this case. *CRLP,* 2001 WL 868007, at *2 n. 1.

other nations." *CRLP*, 2001 WL 868007, at *4 (citations omitted).

Pursuant to the Mexico City Policy, USAID incorporated the "Standard Clause" into its family planning assistance agreements and contracts. The Standard Clause provides that in order to be eligible for USAID funding, a foreign NGO must certify in writing that it "will not, while receiving assistance under the grant, perform or actively promote abortion as a method of family planning in AID-recipient countries or provide financial support to other foreign nongovernmental organizations that conduct such activities." *Id.* at *5 (quotation marks omitted). The restrictions established in the Standard Clause extend to *all* activities of recipient NGOs, not merely to projects funded by USAID. Thus, in order to receive U.S. government funds, a foreign NGO may not engage in *any* activities that promote abortion. These restrictions do not apply to domestic NGOs such as plaintiff CRLP.

The Mexico City Policy was rescinded by President Bill Clinton in January 1993, but was reinstated by President George W. Bush in March 2001. President Bush issued an official memorandum that restored the abortion-related restrictions discussed above, including the Standard Clause. *See* Memorandum, Restoration of the Mexico City Policy, 66 Fed.Reg. 17,303, 17,309 (Mar. 28, 2001) ("Restoration Memorandum"). Accordingly, as a condition of receiving U.S. government funds, foreign NGOs again are required to agree not to perform or actively promote abortion as a method of family planning.[2]

Plaintiffs bring this suit for injunctive and declaratory relief. Plaintiffs' primary claim, and the one with which the district court appears exclusively to have concerned itself, is based on the First Amendment. The thrust of this claim is that, as a result of the challenged restrictions, foreign NGOs are chilled from interacting and communicating with domestic abortion rights groups such as plaintiff CRLP, thus depriving plaintiffs of their rights to freedom of speech and association in carrying out the mission of the organization. Plaintiffs also allege that the restrictions violate the Equal Protection Clause of the Fifth Amendment by preventing plaintiffs from competing on "equal footing" with domestic anti-abortion groups, and that they violate the Due Process Clause by failing to give clear notice of what speech and activities they prohibit and by encouraging arbitrary and discriminatory enforcement. Finally, plaintiffs attempt to bring a claim under customary international law, the substance of which appears to be identical to their First Amendment claim.

The district court dismissed the action in its entirety on the ground that plaintiffs lack standing under Article III of the Constitution. The court first noted that because the challenged restrictions apply only to foreign NGOs, not to domestic organizations such as CRLP, the Mexico City Policy does not affect plaintiffs directly. *CRLP*, 2001 WL 868007, at *7. The court then applied the three-pronged standing test set out by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), and concluded that plaintiffs had failed to demonstrate that (1) concrete injury in fact, (2) a causal connection between the alleged injury and the government's conduct, and (3) that the alleged injury is sufficiently redressable by a fa-

---

**2.** "Abortion as a method of family planning" does not include "abortions performed if the life of the mother would be endangered if the fetus were carried to term or abortions performed following rape or incest (since abortion under these circumstances is not a family planning act)." Restoration Memorandum, 66 Fed.Reg. at 17,306.

vorable decision. *CRLP,* 2001 WL 868007, at *8–*12.

 Our review is *de novo. See Connecticut v. Physicians Health Servs. of Conn., Inc.,* 287 F.3d 110, 114 (2d Cir. 2002). "The reviewing court may, of course, affirm on any ground appearing in the record below." *MFS Sec. Corp. v. New York Stock Exch., Inc.,* 277 F.3d 613, 617 (2d Cir.2002).

## DISCUSSION

### I. *First Amendment Claim*

#### A. *Plaintiffs' Allegations*

The crux of plaintiffs' First Amendment claim is their contention that the restrictions chill foreign NGOs from collaborating with domestic NGOs like CRLP because such collaboration may be viewed as promoting abortion and thus would jeopardize the foreign NGOs' receipt of U.S. government funds. Plaintiffs argue that such collaboration is essential to their ability to carry out their mission as advocates of reproductive rights and that depriving them of this ability violates their freedom of speech and association.

Specifically, plaintiffs allege that they depend on collaboration with foreign NGOs in order to advocate abortion law reform in foreign countries; to gather reliable information regarding abortion laws; to disseminate publications and reports; to reach audiences worldwide in order to promote abortion law reform; to access victims and witnesses of human rights abuses; to lobby the United States government to rescind the Restoration Memorandum; to influence international conferences, international legal tribunals, and world public opinion; to increase protection for the right to abortion in the United States; and to engage in open and free discussion about abortion. *See* Am. Compl. ¶¶ 7, 85, 88, 90, 91, 105–107.

Plaintiffs list several countries in which they currently have projects involving these activities and where foreign NGOs have agreed to the Standard Clause, *id.* ¶ 71, and they allege that all of these activities are significantly hindered in those countries. The use of the Standard Clause, according to plaintiffs, "prevents Plaintiffs from forming alliances with potential partner organizations in order to increase their abortion-related advocacy efforts' effectiveness." *Id.* ¶ 100. One of the ways in which this problem manifests itself is by depriving plaintiffs of their audience for reproductive rights advocacy. Plaintiffs allege that the use of the Standard Clause "interferes with Plaintiffs' conveyance of their ideas and political speech about abortion by chilling or prohibiting [foreign NGOs] from attending presentations given by Plaintiffs and from listening to Plaintiffs' political advocacy." *Id.* ¶ 106. These hindrances, according to plaintiffs, violate their right to freedom of speech and association. Similarly, plaintiffs allege that the challenged restrictions impede their ability to disseminate publications and reports "because [foreign NGOs] that would otherwise distribute the publications in foreign countries are prohibited or chilled from doing so." *Id.* ¶ 103. Plaintiffs argue that this harm is actionable under Supreme Court precedent holding that "[t]he First Amendment protects [individuals'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer v. Grant,* 486 U.S. 414, 424, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). Plaintiffs also invoke their right to receive information, claiming that the Standard Clause "interferes with Plaintiffs' ability to obtain information necessary to accomplish their abortion law reform efforts from USAID recipient [foreign NGOs]," and impedes plaintiffs' ac-

cess to victims and witnesses of human rights abuses related to reproductive issues. Am. Compl. ¶¶ 101–102. Plaintiffs explain that foreign NGOs are often the only vehicle to provide access to both general information and first-hand accounts regarding conditions in foreign countries, *id.*, and that obtaining such information is necessary for domestic NGOs to fulfill their mission of advocating reproductive rights—including their ability to lobby the United States government, *id.* ¶ 108.

## B. The Planned Parenthood Case

We have been over this ground before. In *Planned Parenthood Federation of America, Inc. v. Agency for International Development*, 915 F.2d 59 (2d Cir.1990), this Court entertained a constitutional challenge to the same Standard Clause incorporated by the USAID into financial assistance agreements with foreign NGOs. Like the instant case, *Planned Parenthood* involved a First Amendment challenge, based on freedom of speech and association, brought by *domestic* NGOs. As in the instant case, the plaintiffs argued before this Court that the Mexico City Policy effectively prevented them from associating and collaborating with foreign NGOs, which in turn prevented them from fulfilling their mission regarding reproductive rights advocacy. *Planned Parenthood*, 915 F.2d at 62–63.

This Court rejected the challenge on the merits, finding "no constitutional rights implicated" by the Policy and the Standard Clause. *Planned Parenthood*, 915 F.2d at 66. The Court reasoned that the domestic NGOs remained free to use their own funds to pursue abortion-related activities in foreign countries and that "[t]he harm alleged in the complaint is the result of choices made by foreign NGOs to take AID's money rather than engage in non-AID funded cooperative efforts with plaintiffs-appellants." *Id.* at 64. "Such an incidental effect" on the activities of the domestic NGOs, the Court held, did not rise to the level of a constitutional violation. *Id.* The Court concluded that "the Standard Clause does not prohibit plaintiffs-appellants from exercising their first amendment rights." *Id.* Moreover, the Court explained that whatever one might think of the Mexico City Policy, "the wisdom of, and motivation behind, this policy are not justiciable issues," and the Court found the restrictions to be rationally related to the "otherwise nonjusticiable decision limiting the class of beneficiaries of foreign aid." *Id.* at 64–65. Having rejected plaintiffs' claims on the merits, this Court declined to address the question of whether plaintiffs had standing under Article III. *Id.* at 66.

*Planned Parenthood* not only controls this case conceptually; it presented the same issue. *Planned Parenthood* rejected the same First Amendment challenge to the same provision—the Standard Clause that was first instituted by President Reagan in the 1980s and was reinstated by President George W. Bush in 2001[3]—and no intervening Supreme Court case law alters its precedential value.

Plaintiffs' attempts to distinguish *Planned Parenthood* are unavailing.

---

**3.** The Standard Clause as restored under President George W. Bush contains minor alterations from the original version challenged in the *Planned Parenthood* case. They are not of significance here. The only substantive difference in the restored Standard Clause is that "treatment of injuries or illnesses caused by legal or illegal abortions" is now excluded from the definition of prohibited abortion-related activities. Restoration Memorandum, 66 Fed.Reg. at 17,311. Other minor alternations include the change from "AID" to "USAID," "grant" to "award," and "birth spacing" to "child spacing." *CRLP*, 2001 WL 868007, at *6 n. 6.

First, plaintiffs argue that *Planned Parenthood* did not involve an equal protection challenge. This is true, but does not affect the First Amendment question. Second, plaintiffs argue that *Planned Parenthood* "mischaracterizes the [restrictions'] effect as 'incidental.'" This argument does not distinguish *Planned Parenthood* at all, but simply disagrees with its holding. Third, plaintiffs argue that the effect on their speech is more substantial than in *Planned Parenthood* because the provision "impedes Plaintiffs' *entire* mission, not just one component of that mission." The significance of this point is not clear to us as a legal matter and, in any event, the allegations made in the two cases are far too similar to support this distinction as a factual matter.

Finally, plaintiffs argue that *Planned Parenthood* "did not assess the right to obtain and impart information," and that the litigants in *Planned Parenthood* "did not claim that their law reform advocacy *in the United States and the United Nations* was impeded." By rejecting plaintiffs' claim that the Mexico City Policy prevented them from associating and collaborating with foreign NGOs, however, this Court's opinion in *Planned Parenthood* did, in fact, assess and reject the claim that plaintiffs' right to obtain and impart information was impeded. *See Planned Parenthood*, 915 F.2d at 63–64 (noting and rejecting plaintiffs' argument that "it is impractical for United States citizens or organizations to engage in abortion-related activities abroad without the cooperation of foreign organizations and that the Standard Clause deters 'many of the most logical and effective foreign partners' "); *Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*, No. 87 CIV. 0248, 1990 WL 26306, at *5 (S.D.N.Y. Mar.7, 1990) ("[P]laintiffs argue that [the Standard Clause] has the effect of preventing foreign NGOs that receive AID funds

and domestic NGOs from associating with each other *for purposes of receiving or disseminating abortion information* using non-U.S. government money ...." (emphasis added)). Likewise, although this Court's opinion in *Planned Parenthood* did not explicitly describe the scope of plaintiffs' claim regarding the restrictions on their law reform advocacy to include advocacy in the U.S. and in international tribunals, our holding clearly contemplated and rejected that claim. *See Planned Parenthood*, 915 F.2d at 62 (noting that the Standard Clause does not hinder plaintiffs' use of non-AID funds "in the United States or abroad"); *Planned Parenthood*, 1990 WL 26306, at *7 ("[Plaintiffs] also allege that the 'reason for the promulgation of the policy and the Standard Clause was to advance the Reagan Administration's effort to suppress pro-choice views and activities in the United States ... and not for any purported concern with foreign policy ....' " (quoting complaint)).

### C. *The Standing Issue*

 The district court dismissed the instant case, not on the merits as we did in *Planned Parenthood*, but for lack of constitutional standing. A federal court has jurisdiction only if a claim presents a "case" or "controversy" under Article III of the U.S. Constitution. This "irreducible constitutional minimum" of standing requires (1) that the plaintiff has suffered an "injury in fact," i.e., an invasion of a judicially cognizable interest which is concrete and particularized as well as actual or imminent, rather than conjectural or hypothetical; (2) that there is a causal connection such that the injury is fairly traceable to the challenged conduct; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. "Since this case

remains at the pleading stage, all facts averred by the plaintiffs must be taken as true for purposes of the standing inquiry— as they must be for any other issue presented." *Lerman v. Bd. of Elections*, 232 F.3d 135, 142 (2d Cir.2000).

The district court held that plaintiffs failed to show these elements of standing. *See CRLP*, 2001 WL 868007, at *8–*12. In reaching its conclusion, the court relied heavily on our analysis in *Planned Parenthood. See, e.g., id.* at *10 ("The Court of Appeals has already held that the government is within its constitutional authority in imposing restrictions or conditions on the receipt of USAID funding by [foreign NGOs].")*. In particular, the district court placed great weight on our statement in *Planned Parenthood* that the harm alleged by domestic NGOs is the result not of the Mexico City Policy itself, but of "choices made by foreign NGOs to take AID's money rather than engage in non-AID funded cooperative efforts with plaintiffs-appellants." *Id.* at *10, *11 (quoting *Planned Parenthood*, 915 F.2d at 64). Based on this language from *Planned Parenthood*, the district court found that "plaintiffs have failed to show that their alleged harms are caused by the challenged government policies." *Id.* at *12.

It is not clear, however, that the district court's reliance on *Planned Parenthood* is entirely justified in this context. We found in *Planned Parenthood* that the alleged harm suffered by domestic NGOs is attributable to independent decisions of foreign NGOs, but only for purposes of the merits of plaintiffs' First Amendment claims. It does not necessarily follow that *Planned Parenthood* answers the question of causation with respect to constitutional standing.

One reason why *Planned Parenthood* might be deemed to resolve the standing question is that *Planned Parenthood*, though adjudicated on the merits, was decided on the pleadings. Thus, one could argue that this Court decided *as a matter of law* that the Mexico City Policy could not be deemed the legal "cause" of the alleged harm to domestic NGOs. Although this finding was used to form a different conclusion in *Planned Parenthood*—that plaintiffs' claims failed on the merits—it arguably could be employed in our standing analysis here. On the other hand, it could be argued that *Planned Parenthood* is not dispositive, particularly in light of an intervening Supreme Court case that clarified the causation aspect of the standing inquiry. In *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), plaintiffs argued that a Biological Opinion by the Fish and Wildlife Service influenced the Bureau of Reclamation to reduce the quantity of irrigation water available to plaintiffs. Rejecting the government's contention that plaintiffs lacked standing because the Bureau's conduct constituted an "independent" act breaking the chain of causation under *Lujan*, the Supreme Court explained that "[t]his wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Id.* at 168–69, 117 S.Ct. 1154. The Court stated that while "it does not suffice if the injury complained of is the result of the independent action of some third party not before the court ... that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Id.* at 169, 117 S.Ct. 1154 (quotation marks and alterations omitted). *Bennett* can be read to support plaintiffs' standing argument in the instant case.

We are thus faced with a situation of a *sui generis* nature, inasmuch as our conclusion depends in large part on how much weight one places on our language in

*Planned Parenthood*—a case that analyzed essentially the same factual allegations as the instant case but in a somewhat different context. As *Planned Parenthood* does not, as the district court implied, resolve the standing issue conclusively, we are confronted with a novel question of Article III standing.

### D. *The* Steel Co. *Case and Our Authority to Proceed to the Merits*

Because we believe that our decision in *Planned Parenthood* dooms plaintiffs' First Amendment claims on the merits, we must decide whether we should first address plaintiffs' novel theory of constitutional standing with respect to these claims.

Between the time that we decided *Planned Parenthood* and the filing of the instant action, the Supreme Court issued a decision in which it criticized the practice whereby a court proceeds directly to the merits of a case while assuming *arguendo* that the plaintiffs have constitutional standing to bring the suit. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). This practice, referred to by some courts as "hypothetical jurisdiction," *United States v. Troescher*, 99 F.3d 933, 934 n. 1 (9th Cir.1996), was often used by federal courts seeking to avoid a difficult or novel issue of standing in favor of a relatively easy merits question. In *Steel Co.*, however, Justice Scalia explained that the determination of standing is a question of subject matter jurisdiction, and that a court lacks the authority to rule on a case unless it determines that jurisdiction exists. *Steel Co.*, 523 U.S. at 94, 118 S.Ct. 1003. "For a court to pronounce upon the meaning or the constitutionality of a state or

federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Id.* at 101–02, 118 S.Ct. 1003. Justice Scalia's decision in *Steel Co.* commanded a five-Justice majority, although two of the five issued a concurring opinion, which expressed a more permissive view toward the practice of assumed jurisdiction. *See id.* at 110–11, 118 S.Ct. 1003 (O'Connor, J., concurring, joined by Kennedy, J.) (stating that "the Court's opinion should not be read as cataloging an exhaustive list of circumstances under which federal courts may exercise judgment in reserving difficult questions of jurisdiction when the case alternatively could be resolved on the merits in favor of the same party") (quotation marks and alterations omitted). This Court has heeded the admonitions of *Steel Co.*, acknowledging that ordinarily we are not to assume the existence of jurisdiction in favor of reaching an "easier" merits issue. *Fidelity Partners, Inc. v. First Trust Co. of N.Y.*, 142 F.3d 560, 565 (2d Cir.1998); *see also In re Rationis Enters., Inc. of Panama*, 261 F.3d 264, 267–68 (2d Cir.2001) (citing *Steel Co.* rule).

The *Steel Co.* majority opinion, however, discussed several previous Supreme Court decisions which, according to the Court, "must be acknowledged to have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question." *Steel Co.*, 523 U.S. at 101, 118 S.Ct. 1003. Moreover, the Court chose not to state simply that, to the extent that previous cases might be read to permit assumed jurisdiction, those cases are overruled. Instead, the Court distinguished the cases on various grounds, thus leaving their precedential value intact.[4] Two such cases are of particular relevance here.

---

**4.** *See* Joan Steinman, *After* Steel Co.: *"Hypothetical Jurisdiction" in the Federal Appellate Courts*, 58 Wash. & Lee L.Rev. 855, 862 (2001) (noting the *Steel Co.* Court's "embrace, rather than disavowal," of cases such as *Norton* and *Avrech*, both discussed *infra* ).

The first is *Norton v. Mathews*, 427 U.S. 524, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976), in which the Court declined to address a jurisdictional issue and answered the merits question regarding whether certain aspects of the Social Security Act were unconstitutional. The *Steel Co.* Court distinguished *Norton* on the ground that, in *Norton*, "[w]e declined to decide th[e] jurisdictional question, because the merits question was decided *in a companion case, Mathews v. Lucas [*427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976)*]*, with the consequence that the jurisdictional question could have no effect on the outcome." *Steel Co.*, 523 U.S. at 98, 118 S.Ct. 1003 (internal citation omitted). The *Steel Co.* Court explained that the outcome in *Norton* was "foreordained by *Lucas*" and thus "*Norton* did not use the pretermission of the jurisdictional question as a device for reaching a question of law that otherwise would have gone unaddressed." *Id.*

The *Steel Co.* Court also distinguished and did not overrule *Secretary of Navy v. Avrech*, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974). The Court explained, "*Avrech* also involved an instance in which an intervening Supreme Court decision definitively answered the merits question." *Steel Co.*, 523 U.S. at 98–99, 118 S.Ct. 1003. *Avrech* involved a constitutional challenge to a provision of the Code of Military Justice. When another case, *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), rejected a similar constitutional challenge to the

same provision, the Court decided to dispose of *Avrech* on the merits, stating that it was "unwilling to decide the difficult jurisdictional issue which the parties have briefed." *Avrech*, 418 U.S. at 677, 94 S.Ct. 3039. The *Avrech* Court explained its rationale: "We believe that even the most diligent and zealous advocate could find his ardor somewhat dampened in arguing a jurisdictional issue where the decision on the merits is thus foreordained." *Id.* at 678, 94 S.Ct. 3039. The *Steel Co.* Court thus distinguished *Avrech*, finding that the "peculiar circumstances" of *Avrech* did not permit the case to be cited for the more general proposition that any "easy" merits question may be decided on the assumption of jurisdiction. *Steel Co.*, 523 U.S. at 99, 118 S.Ct. 1003.

Thus, the majority opinion in *Steel Co.* appears to allow an exception to the rule against assuming the existence of standing in those "peculiar circumstances" where the outcome on the merits has been "foreordained" by another case such that "the jurisdictional question could have no effect on the outcome," provided the court "d[oes] not use the pretermission of the jurisdictional question as a device for reaching a question of law that otherwise would have gone unaddressed." *Id.* at 98, 118 S.Ct. 1003;[5] *cf. Nippon Steel Corp. v. United States*, 219 F.3d 1348, 1352–53 (Fed.Cir.2000) (using the *Steel Co.* Court's approval of *Norton* as authority to bypass a jurisdictional question and decide the merits in an "unusual situation" where the

5. The *Steel Co.* Court seems to acknowledge this when, after recognizing that cases such as *Norton* and *Avrech* "have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question," the Court urges that these cases do not support a rule that "enables a court to resolve *contested questions of law* when its jurisdiction is in doubt." *Steel Co.*, 523 U.S. at 101, 118 S.Ct. 1003 (emphasis added). Moreover, a majority of the Justices in *Steel Co.* cited *Norton* approvingly for the proposition that a court may assume the existence of jurisdiction in certain circumstances. *See id.* at 110–11, 118 S.Ct. 1003 (O'Connor, J., concurring, joined by Kennedy, J.); *id.* at 111, 118 S.Ct. 1003 (Breyer, J., concurring in part and concurring in the judgment); *id.* at 122 n. 15, 118 S.Ct. 1003 (Stevens, J., concurring in the judgment, joined in relevant part by Souter, J.).

two issues are intertwined). We find ourselves in largely the same situation as the Supreme Court found itself in *Norton* and *Avrech:* plaintiffs in this case challenge a governmental provision (the use of the Standard Clause) as unconstitutional, and there is a controlling case in which this Court entertained and rejected the same constitutional challenge to the same provision. Our outcome on the merits is thus "foreordained" by *Planned Parenthood.* Under the *Norton/Avrech* exception acknowledged in *Steel Co.,* we need not reach the academic question of Article III standing in this case.

Our approach not only comports with the language of the *Steel Co.* majority opinion, but also advances the underlying rationale of *Steel Co.* and makes good sense as a constitutional matter. The concern of the *Steel Co.* majority was that deciding a case on the mere assumption of jurisdiction can lead to the rendering of advisory opinions in violation of Article III: "Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning." *Steel Co.,* 523 U.S. at 101, 118 S.Ct. 1003 (citations omitted). Turning to the instant case, we note that where the precise merits question has already been decided in another case by the same court, it is the adjudication of the standing issue that resembles an advisory opinion—the very concern that animates the *Steel Co.* rule. It would be ironic if, in our desire to avoid rendering an advisory opinion, we were to address a novel standing question in a case where the result is foreordained by another decision of this Court. *See id.* at 123–24, 118 S.Ct. 1003 (Stevens, J., concurring in the judgment)

(noting that by addressing a standing issue unnecessarily "the Court is engaged in a version of the 'hypothetical jurisdiction' that it has taken pains to condemn"). We further note that the question of Article III standing is itself of constitutional dimensions, *see id.* at 124, 118 S.Ct. 1003, and "the Supreme Court has for generations warned against reaching out to adjudicate constitutional matters unnecessarily," *Horne v. Coughlin,* 191 F.3d 244, 246 (2d Cir.1999).

■■ We hold that where, as here, a governmental provision is challenged as unconstitutional, and a controlling decision of this Court has already entertained and rejected the same constitutional challenge to the same provision, the Court may dispose of the case on the merits without addressing a novel question of jurisdiction. The Supreme Court followed this approach in *Norton* and *Avrech,* and approved of those cases in *Steel Co.* Plaintiffs' First Amendment claims are therefore dismissed for failure to state a claim.[6]

## II. Due Process Claim: Lack of Prudential Standing

■ Because *Planned Parenthood* did not address due process claims brought by domestic NGOs in this context, we address the due process claim separately and dismiss it on the alternative ground of prudential standing.

■ "The doctrine of standing, which addresses the question of whether the plaintiff is entitled to have the court decide the merits of the dispute or of particular issues, embraces both 'constitutional' and 'prudential' requirements." *Sullivan v. Syracuse Hous. Auth.,* 962 F.2d 1101, 1106 (2d Cir.1992) (quotation

6. As plaintiffs' claims based on customary international law are substantively indistinguishable from their First Amendment claims, they are dismissed on the same ground. We express no view as to whether those claims are otherwise viable.

marks and brackets omitted). The constitutional requirements, derived from Article III, are the injury in fact, causation, and redressability elements set out by the Supreme Court in *Lujan.* On the other hand, "[t]he prudential requirements of standing have been developed by the Supreme Court on its own accord and applied in a more discretionary fashion as rules of judicial 'self-restraint' further to protect, to the extent necessary under the circumstances, the purpose of Article III." *Id.* (internal citations omitted). Pursuant to the doctrine of prudential standing, a court must ask whether a plaintiff's claim rests on the legal rights of a third party, asserts only a generalized grievance, or asserts a claim that falls outside the zone of interests protected by the legal provision invoked. *See Valley Forge Christian Coll. v. Ams. United,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *In re Appointment of Indep. Counsel,* 766 F.2d 70, 74 (2d Cir.1985). Of particular concern in the instant case is "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked," *Crist v. Comm'n on Presidential Debates,* 262 F.3d 193, 195 (2d Cir.2001) (quoting *Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)), coupled with the rule against asserting the rights of a third party. Plaintiffs' claims do not fall within the "zone of interests" protected by the Due Process Clause.

Plaintiffs' due process claim is based on their allegation that the challenged restrictions fail to give clear notice of what political speech, public education, and law reform activities they prohibit and that they encourage arbitrary and discriminatory enforcement. Am. Compl. ¶ 140. It is not the plaintiffs, however, who are allegedly left uncertain of their rights by unconstitutionally vague language in a government provision; it is the foreign NGOs who are allegedly left in this position. Plaintiffs'

harm is derivative of this due process-type harm, and their alleged injury (albeit an unactionable one) concerns First Amendment interests. Plaintiffs' allegation, simply put, is that the vague language of the Standard Clause causes the foreign NGOs to be overly cautious in avoiding interaction with plaintiffs, which in turn harms plaintiffs' speech and association interests. On appeal, plaintiffs expressly acknowledge that "[t]his vagueness claim is premised on the [restrictions'] chilling effect on protected speech and association." As plaintiffs do not assert a harm to their own interest in receiving due process of law, this is precisely the sort of claim that the prudential standing doctrine is designed to foreclose. Plaintiffs cannot make their First Amendment claims actionable merely by attaching them to a third party's due process interests. *See Haitian Refugee Ctr. v. Gracey,* 809 F.2d 794, 809 (D.C.Cir. 1987) (explaining that because due process rights "do not protect a relationship" between a third party and a litigant, a plaintiff "could never have standing to challenge a statute solely on the ground that it failed to provide due process to third parties not before the court"). Plaintiffs' due process claim is therefore dismissed for lack of prudential standing.

## III. *Equal Protection Claim*

### A. *Plaintiffs Have "Competitive Advocate Standing"*

██ Plaintiffs argue that the district court failed to undertake a separate analysis of their Article III standing to bring an equal protection claim. Because we agree with plaintiffs that the case law regarding constitutional standing for equal protection claims is distinct, and because *Planned Parenthood* does not foreclose this claim on the merits, we address the question of Article III standing with respect to this

claim. As the case law and the legal theories involved are quite different, this constitutional standing analysis does not inform the question on which we reserved judgment above regarding constitutional standing to bring the First Amendment claims. We find that plaintiffs do have constitutional standing to bring an equal protection claim.

With respect to the equal protection claim, the relevant portion of the complaint reads:

> The [use of the Standard Clause] violates the Equal Protection component of the Fifth Amendment to the United States Constitution because it prohibits plaintiffs from associating with USAID-recipient [foreign NGOs] for the purpose of promoting abortion law reform, but permits other United States citizens and residents to associate with USAID-recipient [foreign NGOs] for the purpose of opposing abortion law reform, and, more generally, permits association with USAID-recipient [foreign NGOs] for the purpose of rendering speech opposed to abortion more effective.

Am. Compl. ¶ 138. On appeal, plaintiffs flesh out the equal protection claim by explaining that the use of the Standard Clause, "by prohibiting [foreign NGOs] from collaborating with Plaintiffs, denies Plaintiffs the opportunity to compete on an equal footing with opponents of abortion law reform."

 Though plaintiffs do not employ the term, this argument is essentially a theory that this Court has dubbed "competitive advocate standing." We have acknowledged the possibility that a plaintiff may have standing to bring an equal protection claim where the government's allocation of a particular benefit "creates an uneven playing field" for organizations advocating their views in the public arena. *In re United States Catholic Conference,*

885 F.2d 1020, 1029 (2d Cir.1989). In order to "satisfy the rule that he was personally disadvantaged," a plaintiff must "show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit." *Id.*

Plaintiffs have standing under this theory. CRLP is an advocacy organization that communicates its viewpoint regarding issues of abortion and reproductive rights, and it competes with anti-abortion groups engaged in advocacy around the very same issues. The Standard Clause has bestowed a benefit on plaintiffs' competitive adversaries by rewarding their suppliers of information, the foreign NGOs, with government grants, while withholding those grants from suppliers of information who would deal with CRLP. This is precisely the type of situation that the doctrine of competitive advocate standing contemplates. *See id.; cf. Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 211, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (finding, under the test for standing articulated in *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130, that a non-minority subcontractor had standing to contest a government policy that gave a financial incentive to general contractors to give preference to minority subcontractors in awarding subcontracts).

### B. *The Equal Protection Claim is Without Merit*

 Because this classification "neither proceeds along suspect lines nor infringes fundamental constitutional rights," it must "be upheld against equal protection challenge if there is any reasonable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *see also Weinstein v. Albright,* 261 F.3d 127, 140 (2d Cir.2001). Here there can be no

question that the classification survives rational basis review. The Supreme Court has made clear that the government is free to favor the anti-abortion position over the pro-choice position, and can do so with public funds. *See Rust v. Sullivan,* 500 U.S. 173, 192–94, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Plaintiffs' equal protection challenge is thus without merit.

## CONCLUSION

For the reasons stated, we affirm the district court's dismissal of this action, though on different grounds.