**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 29, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STEPHEN STARKEY, and BEDRA
STARKEY, on behalf of themselves
and on behalf of A.B., C.D., and
E.F.*,

        Plaintiffs - Appellants,

   v.

BOULDER COUNTY SOCIAL
SERVICES; DOREEN MILLER;
BRIAN RUSSELL; HOLLY SMITH;
BARBARA PARK; JULIE
KINTZING; ANN BALDWIN, in their
individual and official capacities,

        Defendants - Appellees.

No. 08-1013

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:06-CV-00659-LTB-KLM)**

---

Samuel Ventola, Ventola & Staggs P.C., Denver, Colorado, for Plaintiffs -
Appellants.

Madeline J. Meacham, Deputy County Attorney, (Shelly Stratton Bailey,
Assistant County Attorney, with her on the brief), Boulder, Colorado, for
Defendants - Appellees.

---

_____
    *We use fictitious initials rather than names to protect the identities of the
children.

Before **HARTZ**, **SEYMOUR**, and **TYMKOVICH**, Circuit Judges.

**HARTZ**, Circuit Judge.

Stephen Starkey, his wife Bedra Starkey, and his three children, A.B., C.D., and E.F., brought this action in federal court under 42 U.S.C. § 1983 against the Boulder County Department of Social Services (BCDSS) and six BCDSS employees—Doreen Miller, Brian Russell, Holly Smith, Barbara Park, Julie Kintzing, and Ann Baldwin—sued in their official and personal capacities (collectively, Defendants). The Starkeys claimed that Defendants deprived Mr. and Mrs. Starkey of custody and contact with A.B., C.D., and E.F. because of their disapproval of the Starkeys' religious beliefs, and that Defendants failed to place the children in a reasonably safe and secure environment while in the custody of BCDSS. They contended that this conduct violated their Fourteenth Amendment substantive-due-process rights to family integrity, their First Amendment rights to the free exercise of religion, and the children's Fourteenth Amendment substantive-due-process rights to reasonably safe and secure placement while in government custody. They also raised claims under Colorado law. They sought injunctive relief and damages.

The United States District Court for the District of Colorado dismissed on Eleventh Amendment sovereign-immunity grounds all claims for damages against BCDSS and the individual Defendants in their official capacities. The court also

denied injunctive relief against all Defendants. It later granted summary judgment against the Starkeys on their § 1983 claims against the individual Defendants in their personal capacities. With no remaining federal claims before it, the court chose not to retain jurisdiction over the state-law claims.

On appeal the Starkeys contend (1) that BCDSS and the individual Defendants in their official capacities were not entitled to sovereign immunity because BCDSS is not an arm of the state of Colorado, (2) that the district court improperly struck portions of the Starkeys' affidavits submitted with their response to Defendants' summary-judgment motion, and (3) that the district court erred by granting summary judgment to the individual Defendants on the First and Fourteenth Amendment claims because there were genuine issues of material fact as to whether all six individual Defendants violated their constitutional rights. We have jurisdiction under 28 U.S.C. § 1291.

We affirm the district court's ruling striking portions of the Starkeys' affidavits, and we hold that the Starkeys have failed to present sufficient evidence to raise a genuine issue that their constitutional rights were violated. Thus, we affirm summary judgment for the individual Defendants in their personal capacities. Because there was no underlying constitutional violation, the Starkeys' claims against BCDSS and the individual Defendants in their official capacities must also fail. For subtle reasons that will be discussed more fully

below, we need not address the jurisdictional issue of Eleventh Amendment sovereign immunity.

## I. BACKGROUND

We summarize the pertinent evidence presented to the district court with respect to Defendants' summary-judgment motion, viewing it in the light most favorable to the Starkeys.[1] *See Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1216 (10th Cir. 2008). A.B. (born in 1991), C.D. (born in 1993), and E.F. (born in 1995) are the children of Mr. Starkey and his former wife, Susan Kozlowski. Mr. Starkey is now married to Bedra Starkey, and Ms. Kozlowski to Robert Kozlowski.

On August 20, 2004, the children contacted BCDSS, alleging abuse by Mr. Starkey and stating that they were planning to run away from home. The children said that Mr. Starkey had punished them by imposing time-outs for several hours, withholding food, forcing them to lie on the floor with their faces down for hours, spanking them, and hitting E.F. on the head. After interviewing Mr. Starkey and the children, Tamara Tacha, a caseworker at BCDSS but not a Defendant, filed a Petition in Dependency or Neglect (D&N Petition) in Boulder County District Court. In addition, the police filed criminal charges of child

---

[1]The Starkeys repeatedly make the baffling claim, without any elaboration, that Defendants presented no evidence to the district court. But the documents that Defendants submitted to the court included transcripts of testimony, sworn interrogatory answers, and extensive agency records (whose admissibility as business records has not been challenged by the Starkeys).

abuse against Mr. Starkey; he pleaded no contest and was sentenced to 18 months' probation.

On August 25 a hearing on the D&N Petition was held in state court. The children's guardian ad litem said that he believed that the children needed to be in foster care. The judge agreed, finding it in the best interests of the children to be placed in the temporary custody of BCDSS. The judge ordered (1) that legal custody of the children be placed with BCDSS, (2) that Mr. Starkey and Ms. Kozlowski have supervised visits with the children, and (3) that Mr. Starkey and Ms. Kozlowski complete psychological evaluations and interactional evaluations with the children.

On September 13 the case was transferred from Tacha to Defendant Miller. Ten days later the state court held another hearing. Mr. Starkey admitted that "[the children] lack proper parental care through the actions or omissions of their parent, guardian, or legal custodian," Aplee. Supp. App. at 756, and that "[t]here was conflict in the home," Aplt. App. Vol. II at 200. The court adjudicated the children "dependent or neglected," *id.*, and ordered that there be no contact between Mr. Starkey and the children until the children were psychologically evaluated.

On October 29 Dr. Suzanne Pinto, a licensed psychologist, reported her evaluation of Mr. Starkey. The report expressed concerns about his psychological state and its effect on the children. It noted that he "ha[d] tried to raise [them] in

isolation of a cult of one," and that only after the children had been removed from Mr. Starkey and placed "in a situation of perceived safety" were they willing to speak of their "considerable distress." *Id.* at 234. "While [Mr. Starkey] does not show all of the characteristics of paranoid schizophrenia," it noted, "this indeed may be possible. He does show a strong delusional system regarding both his relationship with God and in terms of his paranoia regarding others. This has led him to be an abusive individual, both physically, emotionally and spiritually." *Id.* The report further observed that "it is difficult for [Mr. Starkey] to recognize his own foibles and the impact of his behavior on the children." *Id.* at 233. Dr. Pinto concluded her report by recommending that the children not be returned to Mr. Starkey's care at that time.

At the next court hearing, on November 4, 2004, BCDSS submitted a proposed treatment plan for the Starkey family. The judge approved the plan with minor changes. The judge's order reiterated that it was in the best interests of the children to remain in the custody of BCDSS.

Sometime between the November 4 hearing and January 27, 2005, BCDSS moved A.B. to a separate foster home from her brother and sister. During this period all three children had weekly visits with Ms. Kozlowski (and their stepfather) and weekly visits with Mrs. Starkey. They did not have visits with Mr. Starkey.

-6-

On January 27, 2005, a permanency hearing was held in state court. Defendant Miller could not attend because of illness, but Defendant Russell, who had assisted her, testified. Russell said that "[t]he children have expressed a great deal of fear of their father and they've said they do not want to visit with him although at times they vacillate, you know, wondering what it would be like and are dealing with those issues in therapy." *Id.* at 248. The judge concluded that the return of the children to Mr. Starkey and Ms. Kozlowski was not yet appropriate.

In February 2005 the case was transferred from Defendant Miller to Dusti Moats, who is not a defendant in this case. In April, Mr. and Mrs. Starkey began having supervised visits with the children. About a month later A.B. reported to Moats that the children's initial allegations against their father in August 2004 had been exaggerated. She also said that she wanted to have unsupervised visits with her father and that she ultimately wanted to live with him part-time. C.D. confirmed that the allegations had been exaggerated and that she also wanted to live part-time with her father. E.F. continued to allege that his father hit him on the head, although he, too, wished for unsupervised visits and potentially part-time residence with Mr. Starkey.

On June 15 the case was transferred from Moats to Defendant Kintzing (and to Kintzing's supervisor, Defendant Park, in Kintzing's absence). On the same day, A.B. was returned to the custody of Ms. Kozlowski. C.D. and E.F.

were returned to Ms. Kozlowski on June 30. Mr. Starkey and Ms. Kozlowski were apparently given equally divided custody beginning on August 1.

On Wednesday, August 31, 2005, Mr. Starkey picked up the children for his scheduled parenting time. Four days later Mr. Starkey dropped C.D. and E.F. off with Ms. Kozlowski, but A.B. remained with him. On Wednesday, September 7, Mr. Starkey received a call from A.B.'s school because A.B. was having an anxiety attack. He picked her up from school and drove her to the hospital. On the way, A.B. calmed down and told Mr. Starkey that she did not want to go into the hospital for treatment.

That evening Mr. and Mrs. Starkey took A.B. to Victory Church, where she had recently joined a youth group. A religious service at the church was scheduled for 7:00 p.m. to 9:00 p.m. Mr. Starkey returned to the church at 9:00 p.m. to pick up A.B., but he saw that she was praying with two of the youth leaders at the church. One of the two leaders told Mr. Starkey that they could give A.B. a ride home, so Mr. Starkey left A.B. at the church. The leaders brought A.B. home around 1:00 a.m. The next day Mr. Starkey took A.B. to school, but he had to take her home because she was having another anxiety attack. Late that afternoon, Mr. Starkey returned A.B. to Ms. Kozlowski. Two hours later Ms. Kozlowski took A.B. to the emergency department at Exempla Lutheran Hospital because she continued to suffer from an anxiety attack.

About 10 a.m. the next morning, Friday, September 9, Defendant Kintzing received a call from Ms. Kozlowski. Ms. Kozlowski informed Kintzing that A.B. had been admitted to the hospital the night before with an anxiety attack. Kintzing then spoke to Joe O'Cleary, the therapist for the Starkey family, who told her that he had received a call from Mr. Starkey the day before. Mr. Starkey had reported to O'Cleary that A.B. was going through "a conversion ritual reaction" related to having "found [C]hrist," not an "anxiety attack." *Id.* Vol. I at 80. Later that afternoon, Kintzing spoke with Joel Jezek, the West Pines counselor who had evaluated A.B. upon her admission to the hospital the night before. (West Pines is a behavioral health center associated with Exempla Lutheran Hospital.) Kintzing made the following notes on her conversation with Jezek:

> He stated that it took him an hour to get any questions answered and 4 hours to finish the evaluation because of the severe state that she was in physically and mentally. . . . She spoke briefly about being saved, but then wouldn't discuss it. This occurred about 40 times during the interview. Ms. Kozlowski told them that Mr. Starkey had a church in his home, and that [A.B.] was prayed over for 2-3 hours on the 7th of September. [A.B.] had also told him this. . . . . When asked about a comment that Ms. Kozlowski had made to me about Mr. Starkey religiously brain abusing them, he stated that he wouldn't be surprised. He felt that [A.B.] "has a brainwashing dynamic goin[g] on that interfaces with her need for approval and recognition.["] He stated that her reactions and affect were "the strangest I have ever seen", in all of his years of doing psyche evals. Seemed worse than some of his psychotic patients.

*Id.* at 83.

Also on September 9, apparently after Kintzing filed a petition for protective orders, the state court placed the children in the temporary custody of Ms. Kozlowski, allowing Mr. Starkey only supervised contact. The next day, A.B. was admitted to the Colorado Mental Health Institute at Ft. Logan (Ft. Logan) on a 72-hour mental-health hold. A.B. remained at Ft. Logan until she was discharged 11 days later.

In the meantime, on Monday, September 12, the state court held a hearing to consider the protective orders entered on September 9. BCDSS sought placement of the children in the temporary custody of Ms. Kozlowski with only supervised contact for Mr. and Mrs. Starkey. The crux of BCDSS's argument was that two of the three children had recently suffered anxiety attacks or emotional breakdowns after their contact with Mr. Starkey. In support of this argument, BCDSS presented the testimony of two experts, Dr. Michael Stackpool and Dr. Elisabeth Konlos-Hrobsky.

Dr. Stackpool, the attending physician at Exempla Lutheran's emergency department on the night of September 8, testified that he had treated A.B. upon her admission to the hospital. A.B. had been brought in by her mother for what A.B. described as a "five-day anxiety attack." *Id.* Vol. III at 312. A West Pines counselor also evaluated A.B. outside Dr. Stackpool's presence. Dr. Stackpool was told by the counselor that A.B. had recently returned to her mother's home from her first unsupervised visit with her father in ten months, during which she

-10-

had been subjected to a "spiritual cleansing" by Mr. Starkey. *Id.* at 319.

Dr. Stackpool did not know the source of the counselor's information but assumed that he had gotten it from A.B. or Ms. Kozlowski. Dr. Stackpool described A.B. at the hospital as "tearful," *id.* at 315, "babb[ling]," *id.* at 313, and unable "to talk about anything other than the reason that she was there was that there were people dying in New Orleans because of [Hurricane Katrina]," *id.* at 317. He explained:

> She had long, overly-dramatic pauses. Lots of gulping of air, lots of
> hyperventilating. Could not get—could not give me any reason for
> those behaviors. There was no—and I—and I really believe there
> was no way she was gonna be able to talk about anything other than
> the Gulf Coast hurricane.

*Id.* at 317. After evaluating A.B., Dr. Stackpool wrote in his notes: "I feel strongly that this patient should be involved in counseling and after discussing the family situation more with the West Pines counselor, I think probably the father should go back to having supervised visits with his daughter and we have made this recommendation to Social Services." *Id.* at 314 (internal quotation marks omitted).

Testifying next was Dr. Konlos-Hrobsky, a therapist with a Ph.D. in child psychology who worked at the Boulder County Mental Health Center. She had evaluated E.F. the month before at a previously scheduled intake appointment. She said that when she came out to greet E.F. and Ms. Kozlowski in the waiting area, "[E.F.] was curled up on one of the chairs." *Id.* at 327. Ms. Kozlowski explained that Mr. Starkey had shown E.F. an Internet site about fatalities caused

by medication used to treat attention deficit disorder and that E.F. was afraid that the doctor was going to give him medication that could kill him. Ms. Kozlowski said that "[E.F.] had been up all night and he had been vomiting and that he was very anxious about coming to the appointment." *Id.* at 327. E.F. confirmed to Dr. Konlos-Hrobsky that Mr. Starkey had shown him the Internet site that caused his anxiety.

Mr. Starkey then presented his case. He showed that the West Pines counselor had provided Dr. Stackpool with at least two items of erroneous information: First, A.B.'s visit with her father before returning to her mother's home had not been her first unsupervised visit with her father in ten months; joint custody had begun several weeks earlier. Second, any spiritual cleansing to which A.B. had been subjected while in the custody of her father actually took place at Victory Church; Mr. Starkey was not directly involved. Pastor Doug Walker, the youth pastor at Victory Church, testified at the hearing that A.B. had attended a youth service on the evening of Wednesday, September 7. After the service he observed two of his youth leaders praying with and ministering to A.B. He believed that what had happened to A.B. at the church could be described as a "spiritual cleansing." *Id.* at 352.

Counsel for BCDSS asked the court to order that the children remain in the sole custody of Ms. Kozlowski. In counsel's view, "whether this thing that happened on Wednesday the 7th was a spiritual cleansing or not [was] completely

irrelevant." *Id.* at 434. What was important, she said, was "that [A.B.'s] having this panic attack for what she tells the doctor to [sic] the last five days and she was with her father for the last five days." *Id.* In addition, Mr. Starkey had frightened E.F. about his medication and "what the end result was, was a child in the fetal position not even wanting to speak to the evaluator." *Id.* at 435. She argued that removing the children from Mr. Starkey's custody and allowing only supervised contact was therefore necessary because "two out of three children [were] having panic attacks because of contact with their father." *Id.* at 435. The children's guardian ad litem voiced similar concerns about Mr. Starkey's effect on the children.

The judge concluded that it would be in the best interests of the children to remain in the custody of Ms. Kozlowski. The judge expressed concern about A.B.'s mental state and E.F.'s behavior. Although little mention of C.D. had been made at the hearing, the judge concluded that it would be in the best interests of the children to stay together.

After the judge announced this ruling, the parties discussed a provision in the petition for protective orders that had sought a prohibition on religious discussion between Mr. Starkey and the children. BCDSS's attorney explained:

> I think the specific—what we were trying to specifically say was in the context of doing it in a therapeutic setting with a therapist, that's fine. But in a supervised visit when it's just the dad and the kids when we don't really know what's going on and all of that, to try to keep the visits a little lighter and focused more on how are you and

-13-

seeing them and letting the more intense issues be dealt with in a therapeutic setting.

*Id.* at 452. She later elaborated that there would be no objection to Mr. Starkey's responding to religious questions from the children, so long as he did not initiate the discussion. Mr. Starkey's attorney objected to any such prohibition as a violation of the Starkeys' First Amendment rights.

The judge's written order specified (1) that temporary custody of the children be with Ms. Kozlowski, and (2) that Mr. and Mrs. Starkey have supervised visits with the children. The order did not include any provision restricting the religious speech of Mr. or Mrs. Starkey with the children. In a minute order issued the following day, the judge clarified the initial order on this point:

> Mr. Starkey and Mrs. Starkey are allowed a minimum of two supervised visits a week. During these visits, they are to be sensitive to the needs of the children and respond to the questions the children have, the requests the children have, and to re-direct the children when appropriate. If the children bring up a request to spend time together in prayer or other religious event, then Mr. and Mrs. Starkey should respond appropriately—supporting their children's needs and encouraging their children. The Court is not concerned if anything religious occurs during visits, the Court is only concerned that the children leave those visits feeling cared for, supported, and encouraged by the time spent with the Starkeys.

Aplee. Supp. App. at 777.

On September 21, 2005, A.B. was discharged from Ft. Logan. A.B.'s discharge report, signed by Nurse Practitioner Mary Hamilton and Dr. Robert Hernandez, included the statement: "At the time of admission, the patient's

-14-

social worker expressed deep concern that during the patient's stay at her father's, that she had been 'brain washed' religiously by her father who apparently started his own church a number of years ago and is very heavily into religion." Aplt. App. Vol. I at 46. The report recommended that "the family all get help with these varying problems before the patient would be able to return home." *Id.* at 47–48.

On the day of A.B.'s discharge from Ft. Logan, another hearing was held in state court to determine her placement. BCDSS sought to have A.B. removed from the custody of both parents and temporarily placed in its custody. Ms. Kozlowski agreed, but Mr. Starkey sought custody of A.B. The only witness to testify at the hearing was Mary Hamilton, the psychiatric nurse practitioner who had treated A.B. at Ft. Logan. She had met daily with A.B. during her stay.

Hamilton expressed concerns about A.B.'s returning to the custody of either Ms. Kozlowski or Mr. Starkey. According to Hamilton, A.B. "felt like there was a lot of chaos in the family," and this had been "overwhelming" to her. *Id.* Vol. IV at 481. She explained that A.B. "tries to take responsibility and emotionally care-take both of her parents." *Id.* at 481. Hamilton noted that A.B. had expressed fear of her father, and that during the ten days of her treatment at Ft. Logan, she had vacillated between wanting to return to her mother's home, her father's home, or to a foster home. On cross-examination by the Starkeys' lawyer, Hamilton said that she had received "secondhand information" from a

"caseworker" that it was Mr. Starkey's fault that A.B. ended up in the hospital. *Id.* at 488–89. But she was not asked to expand on this point. Regardless, Hamilton's recommendation that A.B. be placed in a foster home did not rest on the information that she heard from the caseworker. She expressed her opinion that if A.B. were to return home to either parent, "she would get right back into not taking care of herself emotionally and trying to take care of both of her parents and I think when she does that, her level of stress goes up and she becomes very overwhelmed." *Id.* at 484. The children's guardian ad litem accepted Hamilton's assessment and agreed with the conclusion that placement in foster care would be in A.B.'s best interests.

The judge agreed, finding it in A.B.'s best interests to be placed in the custody of BCDSS. The judge found that A.B. needed to be placed in a safe and stable environment, away from the chaos surrounding her family, in order to take care of herself. After her discharge from Ft. Logan, A.B. was placed in a group foster home. Both parents were allowed supervised contact with A.B. E.F. and C.D. remained in the temporary custody of Ms. Kozlowski.

On November 16, 2005, E.F. and C.D. were placed in the joint physical custody of both parents, but a week later they were placed in Mr. Starkey's custody by agreement of the parties. On December 12 Mr. Starkey submitted to the district court an evaluation from a treating therapist and an affidavit from the

therapist in support of A.B.'s placement in his custody. On December 23 the district court entered an order placing custody of A.B. with Mr. Starkey.

## II. DISCUSSION

The Starkeys claim violations of three constitutional rights: their Fourteenth Amendment substantive-due-process rights to family integrity, their First Amendment rights to the free exercise of religion, and the children's Fourteenth Amendment substantive-due-process rights to a reasonably safe and secure environment while in government custody. The district court held that the claims against BCDSS and the individual Defendants in their official capacities were barred by Eleventh Amendment sovereign immunity because BCDSS is an arm of the state. It also granted summary judgment to the individual Defendants in their personal capacities. As to Defendants Smith, Park, Baldwin, and Russell, the court ruled that the Starkeys had not provided evidence that any of them had violated the Starkeys' constitutional rights. The court made the same ruling with respect to Defendant Miller, but also relied on the issue-preclusive effect of the state court's findings relating to the period of time that Miller worked on the Starkeys' case. Finally, the court concluded that Defendant Kintzing was protected by qualified immunity because the uncontradicted evidence showed that her conduct was "objectively reasonable in light of the information she possessed at the time." Aplt. App. Vol. V at 745. On appeal the Starkeys contend (1) that Eleventh Amendment sovereign immunity is not applicable because BCDSS is an

-17-

arm of goverment and (2) that the district court erred in granting summary judgment to the individual Defendants in their personal capacities. They also challenge the district court's ruling that struck portions of affidavits that they submitted in support of their claims.

First, we affirm the district court's ruling on the affidavits. We then affirm the summary judgments entered in favor of the individual Defendants in their personal capacities because the evidence on which the Starkeys rely does not support the allegations that their constitutional rights were violated. In the absence of a constitutional violation, neither BCDSS nor the individual Defendants in their official capacities can be held liable, so we can affirm judgment in their favor without deciding whether they are entitled to Eleventh Amendment sovereign immunity.

### A.    Affidavits

Mr. Starkey, Mrs. Starkey, and A.B. submitted affidavits with their response to Defendants' summary-judgment motion. Defendants moved to strike the affidavits on various grounds. In ruling on the motion the district court first noted "that the affidavits do not appear to be sworn before someone who is authorized to administer an oath and may be stricken *sua sponte* on that basis alone." *Id.* Vol. V at 732. But because Defendants had not objected to the affidavits on this ground, the court proceeded through the affidavits line by line, striking portions that (1) were not based on personal knowledge, (2) were mere

speculation, (3) were inadmissible hearsay, or (4) were conclusions of law or ultimate fact. The Starkeys challenge the court's decision to strike portions of the affidavits.

The Starkeys' challenge, however, is inadequate. The only ground for striking that they confront is lack of personal knowledge; they contend that the affidavits "clearly demonstrate personal knowledge." Aplt. Br. at 19. But every statement in the affidavits that was stricken for lack of personal knowledge was also stricken for one or more other reasons. The Starkeys' briefs on appeal do not address these other reasons. When an appellant does not challenge a district court's alternate ground for its ruling, we may affirm the ruling. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877 (10th Cir. 2004) (affirming on district court's alternate ground for judgment that was not addressed in appellant's brief on appeal); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002) (we do not address issues not adequately briefed). We therefore reject the Starkeys' challenge to striking portions of the affidavits.

### B.    42 U.S.C. § 1983 Claims Against BCDSS Employees In Their Personal Capacities

We review the district court's grant of summary judgment de novo. *See Pignanelli*, 540 F.3d at 1216. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

### 1. Family-Integrity Claim

The Starkeys contend that Defendants violated their substantive-due-process rights to family integrity by depriving Mr. and Mrs. Starkey of custody and contact with the children. "[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). *See J.B. v. Washington County*, 127 F.3d 919, 927 (10th Cir. 1997) ("[The] right of familial association [of plaintiffs, a mother and child,] is included in the substantive due process right of freedom of intimate association . . . ."). But this right to family integrity "has never been deemed absolute or unqualified." *Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994). "Courts have recognized that the constitutional right to familial integrity is amorphous and always must be balanced against the governmental interest involved." *Id.*

We need not resolve the dispute between the parties regarding whether the government's interest in the welfare of the children outweighed the Starkeys' rights to family integrity. We are persuaded by Defendants' alternative defense that if there was any interference with the Starkeys' constitutional rights, Defendants did not cause it. They correctly assert that "[t]he [state] court made every significant decision about custody, visitation and treatment." Aplee. Br. at 21. The Starkeys do not contest that the evidence presented to the state court was

sufficient to justify the court orders removing custody and limiting contact. Rather, they contend that the "orders were entered based upon the <u>knowingly false</u> statements made by Defendants to caregivers, which were then repeated as hearsay to the court." Aplt. Br. at 17. In other words, they claim that the court orders were fraudulently induced by Defendants.

We will assume for purposes of this appeal that it would be a constitutional violation for Defendants to have obtained the state-court orders through the presentation of fabricated evidence. *Cf. Malik v. Arapahoe County Dept. of Soc. Servs.*, 191 F.3d 1306, 1316 (10th Cir. 1999) (government officials' procurement of court order to seize a child "'through distortion, misrepresentation, and omission'" was a violation of the Fourth Amendment). The evidence relied upon by the Starkeys, however, does not create a genuine issue that the state court's decisions were based on evidence knowingly falsified by Defendants.

Four separate court proceedings are at issue: (1) on August 25, 2004, the state court ordered that legal custody of the children be placed with BCDSS and that Mr. Starkey have only supervised contact with the children; (2) a year later, on September 9, 2005, the state court ordered that temporary custody of the children be placed with Ms. Kozlowski and that Mr. Starkey have only supervised contact with the children; (3) on September 12, 2005, the state court affirmed its order placing the children in the temporary custody of Ms. Kozlowski and limited

the contact of both Mr. and Mrs. Starkey; and (4) on September 21, 2005, the state court ordered that custody of A.B. be placed with BCDSS.

It is not clear from the Starkeys' briefing whether they allege that Defendants obtained the first order, in August 2004, through fraudulent means. They do allege that Defendants knew that the children's allegations about their father were false. But there is no evidence that Defendants had received any information that the children had made false allegations about their father until the children recanted some of their allegations in May 2005, nine months after the first order. The Starkeys have directed us to no evidence in the record that Defendants fabricated evidence to obtain this first order.

The Starkeys allege that the remaining three orders, which were entered in September 2005, were obtained only because Defendants "invented" a claim that Mr. Starkey had subjected A.B. to a "coercive 'spiritual cleansing'" that resulted in her hospitalization. Aplt. Br. at 3–4. According to the Starkeys, Defendants provided this false information to the children's caretakers, who then repeated it through their testimony to the court. In support of these allegations, the Starkeys direct us to (1) Dr. Stackpool's September 12 testimony (as described by the Starkeys) that A.B. "had a history of emotional abuse by her father, that she had just returned [to his home] after a ten-month hiatus, and [that] she had just been subjected to a 'spiritual cleansing' [by her father]," *id.* at 4; (2) a notation in A.B.'s discharge report from Ft. Logan that states: "At the time of admission, the

patient's social worker expressed deep concern that during the patient's stay at her father's, that she had been 'brain washed' religiously by her father who apparently started his own church a number of years ago and is very heavily into religion," Aplt. App. Vol. I at 46; and (3) Hamilton's testimony at the September 21 hearing that she had received "secondhand information" from a "caseworker" that it was Mr. Starkey's fault that A.B. ended up in the hospital, *id.* Vol. IV at 488–89.[2]

The statements upon which the Starkeys rely contain seven factual assertions: (1) that Mr. Starkey had a history of emotionally abusing the children; (2) that A.B.'s hospitalization occurred immediately after her first unsupervised visit with Mr. Starkey in ten months; (3) that A.B. had been subjected to a spiritual cleansing by Mr. Starkey; (4) that A.B. had been brainwashed by Mr. Starkey; (5) that Mr. Starkey started his own church; (6) that Mr. Starkey was heavily into religion; and (7) that A.B.'s hospitalization was caused by Mr. Starkey. For one of these assertions to support the Starkeys' claim that the court's orders were caused by Defendants' concoction of false evidence, the Starkeys would have to prove (1) that the assertion was false, (2) that Defendants were the source of the assertion, (3) that Defendants knew the assertion to be

---

[2]The Starkeys also contend that Defendant Kintzing suggested to A.B. that Mr. Starkey had raped her and told her not to defend her father. They fail, however, to tie that allegation to any constitutional claim; indeed, they recite no harmful consequences from the alleged statement. Therefore, we need not address it further.

false, and (4) that the state court relied on the assertion in rendering one of its orders. As we now proceed to show, none of the assertions satisfies all four conditions.

Two of the seven assertions (numbers 5 and 6) are not contestable, or at least not contested by the Starkeys. That Mr. Starkey was "heavily into religion," *id.* Vol. I at 46, is established by the Starkeys' briefs on appeal, as well as by the record. As for the assertion that Mr. Starkey "started his own church a number of years ago," *id.*, Mr. Starkey testified on direct examination during the September 12 hearing that he and Mrs. Starkey had "worship service[s]" in their home. *Id.* Vol. III at 376. The children's guardian ad litem pursued the matter in the following exchange:

> Q: Mr. Starkey, I want to talk about the religious environment in your home. In fact, there's a church in your basement; is that correct?
>
> A: I have no basement.
>
> Q: Okay. Where you have service at your house?
>
> A: Yes.
>
> Q: And when the children are there, they participate in the service, correct?
>
> A: No.
>
> Q: They do not?
>
> A: Nope.

Q:        How many mem—how many individuals do you have in the congregation?

A:        I no longer have any members in my congregation. In the—

Q:        You indicated—

A:        —past—

Q:        —earlier in your testimony that you do not speak as a pastor, that Bedra speaks?

A:        Yes, I have been preaching outside of my home for the past year in other men's churches.

Court:    I'm sorry, in other what?

A:        Other men's churches. I'm a back-up—I'm a back-up pastor and preacher to the Denver Rescue Mission.

Court:    Oh.

Q:        So who does Bedra speak to?

A:        Since we haven't had any members for quite some time, she preaches to me.

Q:        Outside of the presence of the children?

A:        The children haven't been home. For the last five weeks, they have not participated because they are not there on Sunday nights. So they—they have only been—well, it's been over a year.

*Id.* at 410–11. Mr. Starkey has not specifically denied that he started his own church, and his testimony certainly suggests that he did so.

As for assertions 1 and 4, the Starkeys have failed to present evidence that Defendants concocted the allegations that Mr. Starkey had a history of emotionally abusing the children or that he had brainwashed them. The children reported physical and emotional abuse to BCDSS in August 2004. Although the children later claimed that their initial allegations against their father had been exaggerated, they did not fully recant. Moreover, Mr. Starkey pleaded no contest to criminal charges of child abuse stemming from the children's allegations in 2004. And Dr. Pinto's evaluation in October 2004 stated that Mr. Starkey was "an abusive individual, both physically, emotionally and spiritually." Aplt. App. Vol. II at 234. Perhaps Mr. Starkey did not emotionally abuse his children, but the evidence in the record could not support a finding that any Defendant knowingly made a false charge of such abuse.

The same can be said with respect to the brainwashing assertion. The only evidence that any Defendant alleged that Mr. Starkey had brainwashed the children appears in A.B.'s discharge report from Ft. Logan on September 21, 2005. But before A.B.'s admission to Ft. Logan, Kintzing had substantial information that would support such an allegation: Ms. Kozlowski told Kintzing that Mr. Starkey had "religiously brain abu[sed]" the children in the past, *id.* Vol. I at 83. Also, the West Pines counselor reported to Kintzing that Ms. Kozlowski had told him that "Mr. Starkey had a church in his home, and that A.B. was prayed over for 2-3 hours on the 7th of September," *id.*, and that he was

concerned that A.B. had "a brainwashing dynamic goin[g] on," *id.* This record cannot support the Starkeys' assertion that Defendants fabricated the allegation that A.B. had been brainwashed by her father.

Turning to assertions 2 and 3, the Starkeys have presented no evidence that Defendants were the source of the (inaccurate) statements that A.B. had her first unsupervised visit with her father immediately before her hospitalization and that Mr. Starkey had subjected her to a spiritual cleansing. These inaccurate statements were made by Dr. Stackpool in his testimony on September 12, 2005. The Starkeys contend that Dr. Stackpool testified that he "did not know the source of [these] allegations, but that they would not have come from the child's birth mother." Aplt. Br. at 4. The record is to the contrary. Dr. Stackpool testified that he treated A.B. upon her admission to the emergency department, that a West Pines counselor evaluated her outside his presence, and that he learned from that counselor that A.B. had just had her first unsupervised visit with Mr. Starkey in ten months, during which she had been subjected to a "spiritual cleansing" by her father. Aplt. App. Vol. III at 319. Dr. Stackpool said that he did not know the source of the counselor's information, but he assumed that the counselor obtained it from A.B. or Ms. Kozlowski. Kintzing did not learn of A.B.'s hospitalization until Ms. Kozlowski called her the following morning. Nothing suggests that any Defendant was the source of Dr. Stackpool's misinformation, directly or indirectly. (We also note that the factual errors in Dr. Stackpool's testimony were

corrected during the Starkeys' later presentation of their case at the same hearing. Mr. Starkey testified that joint custody had begun several weeks before A.B.'s hospitalization; and Pastor Walker testified that the "spiritual cleansing" had occurred at Victory Church, *id.* at 352, and that Mr. Starkey was not directly involved.)

One assertion (number 7) remains—that Mr. Starkey caused A.B.'s hospitalization. The only "evidence" that any BCDSS employee made such an assertion was elicited during the Starkeys' cross-examination of Hamilton, the psychiatric nurse who testified at the final hearing, on September 21, 2005. The Starkeys' attorney asked Hamilton whether A.B. had ever "told somebody else something that would indicate that it was her father's responsibility that she had ended up in the hospital." *Id.* at 488. Hamilton responded that she had heard "secondhand information about that" from "her caseworker." *Id.* at 488–49. The Starkeys' attorney did not have Hamilton expand on this point. Such vague testimony cannot support a claim that a Defendant alleged that Mr. Starkey caused her hospitalization.

Moreover, and perhaps more importantly, the Starkeys have failed to show that any false information from Defendants influenced the state court in issuing the various orders that interfered with the Starkeys' family integrity. To begin with, the Starkeys have utterly failed to show what evidence and argument, if any, was presented to the state court on September 9, 2005, when the court ordered

-28-

that temporary custody of the children be placed with Ms. Kozlowski and that Mr. Starkey have only supervised contact with them. As for the September 12 order, which affirmed placement of the children in the temporary custody of Ms. Kozlowski and limited their contact with Mr. and Mrs. Starkey, we have a transcript of the proceedings, but nothing suggests that false information from Defendants played a role. Dr. Stackpool's opinion was based on his observations of A.B. at the hospital—that she was tearful, babbling, and focused on Hurricane Katrina—and on the information that he learned from the West Pines counselor (none of which can be traced to a BCDSS employee). Furthermore, there is no evidence that Dr. Stackpool's opinion was anything other than his own, independent conclusion. As for the factual errors in Dr. Stackpool's testimony (regarding when Mr. Starkey had begun having unsupervised visits and whether he participated in the "spiritual cleansing"), they were corrected later in the proceeding; it would be pure speculation to say that they affected the court. The other expert who testified at the hearing, Dr. Konlos-Hrobsky, based her opinion on her observations of E.F. a month before A.B.'s hospitalization. She testified about E.F.'s disturbed emotional state after Mr. Starkey had shown him an Internet site that mentioned fatalities caused by medication used to treat attention deficit disorder. There is no evidence to support an inference that she was influenced by an allegation or opinion stated by BCDSS personnel.

Finally, the state-court order on September 21, placing A.B. in the custody of BCDSS, was based on the expert testimony of Mary Hamilton, a psychiatric nurse at Ft. Logan, who was the only witness to testify at the hearing. Her opinion was clearly based on her daily meetings with A.B., not on reports by BCDSS. And her opinions made no reference to the matters that are the source of the Starkeys' allegations. She testified that the "chaos" in A.B.'s family was "overwhelming to [A.B.]," and that, over the course of ten days, A.B. had expressed a desire to be placed with her mother, with her father, and in foster care. *Id.* Vol. IV at 481. Hamilton noted that A.B.'s "disorganized thinking and level of stress h[ad] decreased quite a bit" during her time at Ft. Logan, *id.* at 479, but she concluded that "it would be most appropriate for her to go to foster placement," *id.* at 483. She doubted the wisdom of placing A.B. with either parent:

> My concern would be that she would get right back into not taking care of herself emotionally and trying to take care of both of her parents and I think when she does that, her level of stress goes up and she becomes very overwhelmed. And I think right now that, you know, we just got her stabilized and I think that if she was in a neutral place for a period of time, that that would allow her to become even more stable and kind of sort through some issues.

*Id.* at 484. The state court relied on Hamilton's testimony when explaining its decision. After noting that A.B. "had changed her mind three times about where she wants to be" during her stay at Ft. Logan, *id.* at 516, the court concluded that it would be in A.B.'s best interests to be placed in foster care:

-30-

> A.B. needs to take care of herself. She needs to get well. She needs to be removed from the chaos. . . . She needs to get off of the roller coaster ride. She needs to feel safe and stable so that she can work on things that 14-year-old kids work on. Not on taking care of your parents because they have a really high conflict divorce. She needs to be 14 and we need to get her there.

*Id.* at 518. On this record, the Starkeys have not shown that anything a Defendant may have reported had any effect on Hamilton's testimony or on the state court's order.

In sum, the Starkeys have failed to raise a genuine issue that the state-court orders were fraudulently induced by Defendants. Accordingly, we affirm the summary judgment for the individual Defendants in their personal capacities on the Starkeys' family-integrity claim.

### 2.    Free-Exercise Claim

The Starkeys also contend that Defendants violated their First Amendment rights to the free exercise of religion. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990) (internal quotation marks omitted). Thus, the government may not "impose special disabilities on the basis of religious views." *Id.*

The Starkeys allege that Defendants conspired to deprive Mr. and Mrs. Starkey of custody and contact with the children "because of their disapproval of [the Starkeys'] Pentecostal or 'fundamentalist' religious beliefs."

Aplt. Br. 11. The Starkeys, however, point to very little record support for their contention that Defendants' conduct was motivated by religious bias. The only evidence they cite in their briefs on appeal is the notation in A.B.'s discharge report from Ft. Logan, which states: "At the time of admission, the patient's social worker expressed deep concern that during the patient's stay at her father's, that she had been 'brain washed' religiously by her father who apparently started his own church a number of years ago and is very heavily into religion." Aplt. App. Vol. I at 46.[3] Perhaps in isolation this statement might suggest Defendants' bias. But here the statement was made as A.B. was being hospitalized in an emotionally devastated state after suffering from what she described as a "five-day anxiety attack," *id.* Vol. III at 312, and being subjected to what her pastor described as a "spiritual cleansing," *id.* at 352. Moreover, Kintzing had been told by two of A.B.'s caretakers—Ms. Kozlowski and the West Pines counselor—that "Mr. Starkey had a church in his home," "[A.B.] was prayed over for 2-3 hours on the 7th of September," A.B. may have had "a brainwashing dynamic goin[g] on," and "Mr. Starkey had 'religiously brain abus[ed]" the children in the past. *Id.* Vol. I at 83. In addition, Kintzing had learned from the Starkey family therapist that Mr. Starkey had described A.B. as "going through a conversion ritual

---

[3]The Starkeys' opening brief refers to other alleged evidence of religious bias, but the portions of the record that they cite do not contain the described evidence. They also cite an assertion in Mrs. Starkey's affidavit that Defendants were motivated by religious bias. But the district court struck that assertion.

reaction." *Id.* at 80. In this context, particularly when the discharge report made no comment about the nature of the Starkeys' religious beliefs, an inference of religious bias is a stretch.

In any event, the Starkeys cannot support a claim that any adverse consequences resulted from this alleged bias. Their sole claim of injury from the religious bias is the deprivation of Mr. and Mrs. Starkey's custody of and contact with the children. But, as we have already explained in rejecting the Starkeys' family-integrity claim, they have pointed to no evidence that Defendants caused these deprivations. Rather, the state court ordered the deprivations based on the testimony of independent professionals who had treated the children and concluded that restrictions on custody and contact would be in the children's best interests. As a result, the Starkeys' claim must fail, and the district court properly granted summary judgment to the individual Defendants in their personal capacities.

### 3.    Safe-And-Secure-Environment Claim

The Starkeys' complaint alleged: "During the period from September 12, 2005 to December, 2005, Ms. Park, Ms. Kintzing and/or Ann Baldwin repeatedly endeavored to force the children in foster care or their mother's care, despite the obvious physical and emotional dangers of such placement." *Id.* at 14 ¶ 15. They may have been attempting to state a claim that Defendants violated the children's substantive-due-process rights to placement in a reasonably safe and secure

environment while in the custody of BCDSS.  *See Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 892–93 (10th Cir. 1992) (recognizing constitutional right to reasonably safe conditions in foster care).  And they appear to be referring to such a claim when they assert in their opening brief on appeal that "the children have been subjected to horrific living conditions, and [A.B.]. . . . has been subjected to emotional and sexual abuse in foster care."  Aplt. Br. at 6. That brief, however, cites no evidence in the record that would support such a claim.  The only cite in support is a portion of A.B.'s affidavit, but the district court struck the relevant language from the affidavit, and we have affirmed the court's ruling.  Accordingly, the Starkeys' claim lacks evidentiary support, and we must affirm the judgment in favor of the individual Defendants in their personal capacities.  *See Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (refusing to consider "unsubstantiated allegations" on appeal).

Although the Starkeys' reply brief cites additional evidence in support of their safe-environment claim, we decline to consider that evidence.  "This court does not ordinarily review issues raised for the first time in a reply brief."  *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000).  This rule protects us "from publishing an erroneous opinion because we did not have the benefit of the appellee's response."  *Id.*  The same rationale applies when the only evidence supporting a claim is not cited until the reply brief.  *See Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004) (reply brief's citations

to the record "[came] too late"); *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (designating specific portions of record (to support opposition to summary judgment) for first time in reply brief "[came] far too late").

## C. 42 U.S.C. § 1983 Claims Against BCDSS And Employees In Their Official Capacities

The district court dismissed the Starkeys' § 1983 claims against BCDSS and the six BCDSS employees in their official capacities on the ground that BCDSS is an arm of the state of Colorado protected by Eleventh Amendment sovereign immunity. *See Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000) ("[T]he arm-of-the-state doctrine bestows [Eleventh Amendment sovereign] immunity on entities created by state governments that operate as alter egos or instrumentalities of the states." (internal quotation marks omitted)); *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996) (employees of entity that is found to be an arm of the state, who are sued in their official capacities, also entitled to Eleventh Amendment sovereign immunity). BCDSS and its employees urge us to affirm the dismissal on this ground.

Ordinarily, we would have to resolve the sovereign-immunity question before addressing the merits of the claim, even if the sovereign-immunity question were difficult and we could easily decide the merits in favor of the defendants. *See Martin v. Kansas*, 190 F.3d 1120, 1126 (10th Cir. 1999) (state's assertion of sovereign immunity must be resolved before addressing merits of

underlying claim), *overruled on other grounds by Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001). This requirement follows from the jurisdictional nature of Eleventh Amendment sovereign immunity, *see Brockman v. Wyo. Dep't of Family Servs.*, 342 F.3d 1159, 1163 (10th Cir. 2003) (Eleventh Amendment sovereign immunity "is a threshold jurisdictional issue"), and a court's lack of authority to decide the merits of a claim unless it has jurisdiction to hear it. In *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), the Supreme Court expressly barred the practice of exercising "hypothetical jurisdiction," *id.* at 101, under which a court, without resolving whether it had jurisdiction, would assume that it had jurisdiction and then dispose of the case by ruling that the claim failed on its merits, *see id.* at 94. Such a ruling, said *Steel Co.*, amounted to a prohibited "advisory opinion." *Id.* at 101.

Nevertheless, we need not decide the sovereign-immunity question before us because *Steel Co.* recognized an exception to the general rule—that jurisdiction must be established before turning to the merits—that applies here. Occasionally a court may rule that a party loses on the merits without first establishing jurisdiction because the merits have already been decided in the court's resolution of a claim over which it did have jurisdiction. In that circumstance, resolution of the merits is "foreordained," *id.* at 98, so the court is not producing an advisory opinion. Rather, it is merely parroting a prior decision. Such parroting is not an

improper aggrandisement of power by the court. The court is not overreaching to decide an issue; after all, the issue has already been decided.

*Steel Co.* acknowledged that the Supreme Court had previously acted in accordance with this "foreordained" exception. *Id.* at 98-100. Two cases, *Norton v. Mathews*, 427 U.S. 524 (1976), and *Secretary of Navy v. Avrech*, 418 U.S. 676 (1974), are particularly instructive. In *Norton* the Supreme Court heard a direct appeal from a three-judge district court. *See* 427 U.S. at 528. Although faced with a jurisdictional question—whether the action was properly brought in the three-judge district court rather than in an ordinary district court—the Court found it unnecessary to resolve this "difficult and perhaps close" question. *Id.* at 530. The merits of *Norton* had been decided in a companion case, *Mathews v. Lucas*, 427 U.S. 495 (1976). Thus, resolution of the jurisdictional question could have no effect on the outcome. As the Supreme Court later explained:

> If the three-judge court had been properly convened, we would have affirmed, and if not, we would have vacated and remanded for a fresh decree from which an appeal could be taken to the Court of Appeals, the outcome of which was foreordained by *Lucas*.

*Steel Co.*, 523 U.S. at 98. *Steel Co.* approved of this analysis because "*Norton* did not use the pretermission of the jurisdictional question as a device for reaching a question of law that otherwise would have gone unaddressed." *Id.* The question of law had already been decided in the companion case.

Similarly, in *Avrech* the Court declined to address the jurisdictional issue before it because "an intervening Supreme Court decision [had] definitively answered the merits question." *Steel Co.*, 523 U.S. at 98–99. After oral argument on the merits, the Court had directed the parties to submit supplemental briefing on the jurisdictional issue. *See Avrech*, 418 U.S. at 677. Before resolving the jurisdictional issue, however, it decided *Parker v. Levy*, 417 U.S. 733 (1974), which had been argued on the same day as *Avrech*. Because *Parker* "would require reversal of the Court of Appeals' decision on the merits," *Avrech*, 418 U.S. at 678, the Court recognized that it was not necessary to resolve the jurisdictional issue before it. It observed that "even the most diligent and zealous advocate could find his ardor somewhat dampened in arguing a jurisdictional issue where the decision on the merits is thus foreordained." *Id.*

*Steel Co.* did not say that the peculiar circumstances of these cases were the only ones in which the merits could be addressed without first finding jurisdiction. In fact, two of the five members of the *Steel Co.* majority explained that "the Court's opinion should not be read as cataloging an exhaustive list of circumstances under which federal courts may exercise judgment in reserving difficult questions of jurisdiction when the case alternatively could be resolved on the merits in favor of the same party." *Steel*, 523 U.S. at 110–11 (O'Connor, J., concurring, joined by Kennedy, J.) (ellipses and internal quotation marks omitted).

-38-

Several circuit courts have applied the "foreordained" exception. In *Center for Reproductive Law & Policy v. Bush*, 304 F.3d 183 (2d Cir. 2002), the Second Circuit found it unnecessary to determine whether a domestic nongovernmental organization (NGO) and its staff attorneys had Article III standing to challenge the constitutionality of a policy requiring foreign NGOs receiving U.S. government funds "to agree not to perform or actively promote abortion as a method of family planning," *id.* at 188. The policy, established in 1984 by President Ronald Reagan's administration, had been suspended by the administration of President Bill Clinton, only to be reinstated by the administration of President George W. Bush in 2001. *Id.* at 187–88. In *Planned Parenthood Federation of America, Inc. v. Agency for International Development*, 915 F.2d 59 (2d Cir. 1990), the Second Circuit had addressed an identical constitutional challenge to the same policy when it was implemented by Reagan and before it was rescinded by Clinton. *Planned Parenthood* had rejected the challenge on the merits, and no Supreme Court decision handed down in the interim would "alter[] its precedential value." *Bush*, 304 F.3d at 190. Thus, the outcome of *Bush* was "foreordained" by *Planned Parenthood*. *Id.* at 195 (internal quotation marks omitted). The Second Circuit held "that where, as here, a governmental provision is challenged as unconstitutional, and a controlling decision of this Court has already entertained and rejected the same constitutional challenge to the same provision, the Court may dispose of the case on the merits

-39-

without addressing a novel question of jurisdiction." *Id.* at 195. It observed that "where the precise merits question has already been decided in another case by the same court, it is adjudication of the standing issue that resembles an advisory opinion." *Id.*

In *Seale v. INS*, 323 F.3d 150 (1st Cir. 2003), the First Circuit also bypassed a jurisdictional question because circuit precedent conclusively resolved the merits issue. An alien had petitioned the district court for a writ of habeas corpus under 28 U.S.C. § 2241, asserting that a deportation order based on his 1987 aggravated-felony conviction violated the Ex Post Facto and Double Jeopardy Clauses. *Id.* at 151. The INS contended that the district court lacked subject-matter jurisdiction to hear the alien's petition and that his objections to the order of removal failed on their merits. *Id.* The First Circuit chose not to address the district court's conclusion that it had jurisdiction to hear the petition under 28 U.S.C. § 2241. *Id.* at 152. Instead, the appellate court concluded that its decision in *Sousa v. INS*, 226 F.3d 28 (1st Cir. 2000), conclusively resolved the merits. The court explained:

> (1) the question of whether the district court has subject matter jurisdiction is close and, for us, one of first impression; and (2) precedent already existing in this circuit . . . conclusively resolves against [the alien] his objections to the order of removal; our merits ruling here is thus "foreordained" and does not create new precedent. In such circumstances, the rule in *Steel Co.* requiring a definitive jurisdictional assessment may be circumvented.

*Seale*, 323 F.3d at 152. *See also United States v. Skeffery*, 283 F. App'x 75, 77–78 (3d Cir. 2008); *21st Century Teleses Joint Venture v. FCC*, 318 F.3d 192, 202–03 (D.C. Cir. 2003) (Williams, J., concurring). But *see 21st Century*, 318 F.3d at 197 (majority opinion).

Finally, the case most similar to the one before us is a precedent from this circuit, *Carolina Casualty Insurance Co. v. Pinnacol Assurance*, 425 F.3d 921 (10th Cir. 2005). The lawsuit arose out of a prior suit by Jeremy Dymowski, a mentally disabled person who worked on a church clean-up crew for Rocky Mountain Job Opportunity Brigade (RMJOB). *See id.* at 923. He sued RMJOB in tort after being injured at work. *See id.* RMJOB's general liability insurer, Carolina Casualty, settled the claim, but only after RMJOB's workers' compensation carrier, Pinnacol Assurance, refused to participate in settlement negotiations. *See id.* Contending that Pinnacol's refusal violated the Americans with Disabilities Act (ADA) and obligations under state law, Carolina Casualty and Denver Fox, the president of RMJOB, sued Pinnacol. *See id.* at 925. The district court granted summary judgment to Pinnacol. *See id.* On appeal Pinnacol argued that it should prevail on the merits and that both plaintiffs lacked Article III standing. *See id.* Both Carolina Casualty and Fox agreed that their claims failed unless Pinnacol had a duty to provide coverage to RMJOB with respect to Mr. Dymowski's suit. *See id.* We held that Carolina Casualty had Article III standing, *see id.* at 927, but that its claims failed because Pinnacol had no such

duty, *see id.* at 932. As for Fox, we relied on the authority cited above and held that we need not resolve whether he had Article III standing because our resolution of the merits of Carolina Casualty's claim—in which we ruled that Pinnacol had no duty to provide coverage to Dymowski—"foreordain[ed]" that Fox would lose on the merits. *Id.* at 927–28.

In short, in *Carolina Casualty* we had jurisdiction to resolve the merits of the claim of one plaintiff, and our decision on that claim foreordained that the claim of the other plaintiff would also fail. It was therefore unnecessary for us to determine whether we had jurisdiction over the second claim.

In the present case we are not addressing claims by two different plaintiffs against the same defendant, but rather claims by the same plaintiffs against two different (sets of) defendants. The principle, however, is identical. We have resolved that the individual Defendants in their personal capacities did not violate any constitutional right of the Starkeys. But under the Starkeys' complaint, BCDSS and the individual Defendants in their official capacities could be held liable only if there was an underlying constitutional violation—that is, only if at least one of the Defendants in a personal capacity had violated at least one of the Starkeys' constitutional rights. *See Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) ("[M]unicipality may not be held liable where there was no underlying constitutional violation by any of its officers."). Therefore, the Starkeys are

foreordained to lose on their remaining claims,[4] and we need not decide whether the Eleventh Amendment deprives us of jurisdiction over those claims.

## V.    CONCLUSION

We AFFIRM the judgment of the district court.

---

[4] We recognize that judgment in favor of the individual Defendants in their personal capacities would not necessarily bar a claim against BCDSS (or the individual defendants in their official capacities). Even if they had violated one of the Starkeys' constitutional rights (in which case BCDSS might be liable), they would be protected by qualified immunity if the constitutional right had not been clearly established at the time of their conduct. *See Buck v. City of Albuquerque*, 549 F.3d 1269, 1277 (10th Cir. 2008). Qualified immunity, however, is available only in suits against officials sued in their personal capacities, not in suits against governmental entities or officials sued in their official capacities. *See Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). Thus, it is essential to our analysis that the ground for affirming judgment in favor of the individual Defendants in their personal capacities was that there was no constitutional violation.